**STATE of Tennessee, Appellee,**

v.

**Gary June CAUGHRON, Appellant.**

Supreme Court of Tennessee,
at Knoxville.

May 10, 1993.

528

Charles W. Burson, Atty. Gen. and Reporter, Merrilyn Feirman, Asst. Atty. Gen., Nashville, Al Schmutzer, Jr., Dist. Atty., Sevierville, for appellee.

Carl R. Ogle, Jr., Jefferson City, for appellant.

## OPINION

DROWOTA, Justice.

The Defendant, Gary June Caughron, appeals directly to this Court his conviction of first degree premeditated murder and the sentence of death imposed by the jury, and his convictions of first degree burglary, and assault with intent to commit rape. He raises numerous issues in this appeal; but, after careful review of the entire record and the law, we find these issues to be without merit. The verdict and judgment are supported by material evidence, and the sentence of death is in no way arbitrary or disproportionate. We therefore affirm the convictions and the sentences.

## THE FACTS

In the early afternoon of July 11, 1987, Christy Jones Scott, the daughter of the victim, 42–year–old Ann Robertson Jones, discovered her mother's partially clothed body lying facedown on a bed in her home in Pigeon Forge. Jones's legs and arms had been bound and tied to the bed with strips of blue terry cloth and pieces of sheer, off-white material like that used for table cloths and curtains. There was a gag tied across her mouth, and strips of the blue terry cloth had been wrapped tightly around her neck.

According to the state's forensic pathologist, Dr. Cleland Blake, Jones had suffered several "blunt traumatic contusions" to her head. These injuries were consistent with those caused by a blunt or rounded object and would have rendered Jones unconscious at some point. Her skull had been fractured and the cartilage in her nose displaced by the beating. She had bled extensively from her mouth and nose. There was a "patch" of "scraping type of injuries caused by some kind of slender linear object ... like whipping marks" on the left back side of her chest beneath her shoulder blades. On the right buttock were "three linear imprints, ... superficial bruises that fit perfectly with four fingers of a hand." Dr. Blake stated that these represented a "hard slap injury to the buttock" inflicted while the victim was still alive. The terry cloth strips around the victim's neck had been pulled so tightly that they had cut off the flow of blood to the victim's brain. The gag, bound so tightly that it cut a deep groove into the corners of the victim's mouth, combined with the hemorrhaging in the nasal passages, had caused her to suffocate. Dr. Blake concluded that Jones had died as a result of asphyxiation while unconscious.

Examination of the scene of the crime revealed that the door to the bedroom where the body was found had been forced open. A purse and its contents lay strewn in the hall. The phone lines to the house had been cut. Sometime within the following two or three weeks, Christy Jones Scott discovered a silver, turquoise and coral ring with a thunderbird design lying on the ground beside her mother's truck, which was still parked at her mother's house.

The key witness in this case was April Marie Ward, who was 14 years old at the time of the killing. Almost everything that the jury learned about Ann Jones's death, other than the description of the crime scene given by investigators, came from April's testimony. That testimony is summarized below.

In early summer 1987, according to April, she and the 27–year–old Defendant met and became romantically involved. April Ward's mother, Lettie Marie Cruze, worked at the Turquoise Jewelry Shop in Settler's Village, a group of shops in Pigeon Forge. Ann Jones ran the Wild Hare Tee Shirt Shop in this same shopping center. April and the Defendant, who was working on a nearby construction project, met on the covered portico (commonly referred to as "the porch") of Settler's Village almost every day.

One night, two or three weeks before the murder, Ann Jones made the Defendant Caughron, who had been drinking, leave her shop because he was acting in a disorderly manner. Jones instructed him to stay away. This upset Caughron, who told April Ward that he would like to catch Ann Jones "out one night" and "slice her throat." The Defendant suggested that April accompany Jones to her house after

work and give him directions on how to get there. He also asked April to watch Jones as she closed her shop and see where she put her money, and to find out if Jones was married and had a telephone or pets.

Because she knew that her mother would have disapproved of her relationship with the Defendant if she had known his true age, April had told her mother that the Defendant was 18. April then became upset with Ann Jones because of a conversation Jones had had with her mother that led to her mother's disapproval of the relationship. April testified that she hated Jones because she had tried to separate her and the Defendant by going to her mother. April also said that she had told the Defendant what Jones had done.

The week before the murder, according to April, she and the Defendant began talking about going to the victim's house. She said that the Defendant instructed her to bring a towel and a knife "to gut" Ann Jones. On the afternoon of Friday, July 10, around 3:00 or 4:00 p.m., the Defendant came by April's house in an older model green and white 442 Oldsmobile Cutlass that he had just purchased. He told April that he would return that night and that the two would go to the victim's house as planned.

April further testified that after her mother went to sleep, she cut a blue terry cloth towel into strips and waited for Caughron to arrive. He picked her up sometime after midnight. He had been drinking but, according to April was "not drunk." (Another witness, Vicky Worth, testified that she had seen the Defendant drinking beer and smoking marijuana at a restaurant around 10 or 11 o'clock that night.) On their way to Ann Jones's house April and the Defendant drank alcohol and took drugs. They walked to the victim's house from the parking lot of a nearby nursing home, where they had left the Oldsmobile. The Defendant carried with him the handle of a pool stick, around which he had placed gray duct tape, and pieces of the sheer material that he already had in his car. The Defendant gave April a survival knife.

April testified that Caughron entered the house by himself and then summoned her inside. As they went down the hall to Jones's bedroom, April could hear her calling, "Who is it? What are you doing?" She testified that the Defendant kicked in the bedroom door, which was locked. According to April, Jones cried and pleaded with them not to hurt her, but the two told her she was going to die. April later testified that after the Defendant hit Jones several times with the pool stick, Jones fell across her bed, became silent and stopped moaning. As April described the scene, the Defendant turned Jones on her stomach and tried unsuccessfully to have sex with her. Complaining that she had "tightened up on him," he then slapped the victim on the right buttock. Unable to complete the sex act with Jones, the Defendant suggested sex with April. She said that after the two of them undressed, Caughron rubbed the victim's blood on both their bodies as they engaged in sex on the floor beside the bed where Jones lay. Finally, April testified, Caughron insisted that they drink some of the victim's blood from shot glasses that he produced for the occasion.

Although April's testimony was confused as to exact chronology, it appears that at some point, Jones was gagged to stop her screaming and tied up with the strips of towel and sheer material. April said that the Defendant tightened the terry cloth strip around Jones's neck, causing the victim to gasp. April testified that she then hit the victim in the head two times. After drinking the blood, April said, she went to the bathroom to throw up, but did not. When she returned to the bedroom, she saw the Defendant striking Jones's back with the pool stick. According to April, the Defendant dumped out the contents of Jones's purse as they left and took what appeared to be a large amount of money. Outside, she said, the Defendant used the knife he had given her to cut the telephone lines to make it appear that whoever had killed Jones had not wanted her to use the telephone.

April testified that she and the Defendant tried to wash the blood off their bodies in the river behind a store in Pigeon

Forge. They next drove to Dollywood, where they met several people, one of whom, Kevin Carver, threatened April with harm if she "got the Defendant in trouble."

Later that same morning, several witnesses saw the Defendant when he arrived at Settler's Village around 10:00–11:00 a.m. Caughron was wearing only cut-off jeans and tennis shoes; he had scratches on his back, stomach and face. Several witnesses saw what they described as dried blood on him. When April's mother commented that "he looked like some sort of wild woman got a hold of him the night before," he "sniggered" and said, "No, I just got in a fight over a beer in a bar in Newport." Caughron cleaned himself in the store's restroom. When Robert Yoakum, Cruze's boyfriend, teased the Defendant about the blood, Caughron told him that "a bitch had hit him in the head with a beer bottle." Caughron then took April aside and warned her not to tell what had happened. The two of them left the shops with Yoakum and went to April's mother's house, where the Defendant bathed. Later that day, Caughron spray-painted his car silver, as he told April, to prevent anyone who might have seen it the night before from identifying it.

Tom Bentley, who worked on the Defendant's car sometime after the killing, testified that he had used pieces of blue terry cloth towel from the trunk of the Defendant's car as grease rags. Bentley testified that the rags matched the towelling that he was shown at trial, which had been tied around the victim's body. When Bentley had asked the Defendant why he wanted to paint the car, Caughron replied, "Well, the lady that got killed, somebody might recognize it and I need to paint it."

Jimmy Lynn Huskey testified that in 1986, when he and the Defendant were friends, the Defendant had a pool stick that came apart like the one Ward had described and that Defendant kept light-colored lace table cloth or curtain material in his car similar to the sheer material used to tie up Jones. The Defendant had also talked to Huskey about tying up women

during sex and said that "slapping them on the butt really turned him on."

Lettie Marie Cruze, April's mother, testified that she had sold the Defendant a silver ring with turquoise and coral inlay and a thunderbird design. This description matched that of the ring Christy Jones Scott had found in her mother's driveway after the killing. While the Defendant was staying at her house shortly after the murder, Cruze noticed that he had "an odd toothbrush for a man," a pink brush with a little rubber tip. Christy Jones Scott testified that her mother's toothbrush, a pink Oral–B brush, was missing after the killing.

The police made little progress in the investigation of the Jones homicide during the year after the homicide. They developed several leads, but none of them panned out. Then, on June 22, 1988, they took the first of six statements they would obtain from April Ward. In it, she disavowed any knowledge of the details of the murder, but made allegations that implicated Caughron, with whom she was no longer romantically engaged. During the summer of 1988, Caughron himself gave law enforcement officers various statements. In turn, he denied knowing the victim, denied any involvement in her death, and denied his actions the day after the killing. He also denied being in a fight in a bar in Newport and told different stories about how he had gotten scratched and bloodied up. Caughron said that he stayed at his grandmother's house on the night of the killing and had been riding around with a friend and his wife at the time of the murder. Over the course of these interviews, the Defendant became more and more nervous. One time when asked who had killed Ann Jones, Defendant stated, "Whoever done it needs help." Another time he said, "If I'm convicted of what I've done, someone will have to pay." When asked why he had tried to kill himself after one of the interrogation sessions with police, he said that "he was depressed and had a lot on his mind." At his last interview, when confronted with falsehoods in his prior statements, Caughron became upset and walked out of the room.

Three inmates who had been incarcerated with the Defendant in the Sevier and Cocke County jails testified about statements that he had made to them concerning the victim and her death. When, in the summer of 1988, Tim McGaha had asked the Defendant if he had committed the murder, Caughron "just smiled." He told McGaha that he had been drunk and partying the night of the murder. He called the victim a "bitch." He also told McGaha he had lost a ring. Caughron told another prisoner, Roy Haynes, that on the night of the murder, he and his girlfriend had driven to a house on Cove Road or Cove Mill Road (the victim lived on Cole Drive) in Pigeon Forge and that from that point "he couldn't remember nothing ... he was so messed up on cocaine." The Defendant told Haynes that when he woke up the next morning he had blood all over him and that he did not know whether or not he had killed the victim. After looking at a newspaper article mentioning the homicide, the Defendant told Haynes that he thought his girlfriend was "snitching" on him. A third inmate, Bobby Floyd, testified that Defendant told him that the victim was a "bitch," who had threatened to "tell some girl's mother how old he was;" that the only evidence police had against him was an article of clothing with blood on it; and that "the only mistake he [had] made was involving April."

The Defendant presented evidence that, based on evidence gathered at the crime scene, none of the tests or analyses performed by forensic scientists from TBI and the FBI had connected him with the killing. His fingerprints were not found in the house. A plaster cast of a shoe print found outside the house was consistent with a boot owned by Kenneth Ogle. Ogle had been a boyfriend of Teresa Goad, one of the victim's daughters. In September 1986, he had broken into the victim's home and at knifepoint had pushed Teresa to the bed and attempted to tie her hands with strips of sheet. Three witnesses testified that the Defendant was in the habit of spray painting his "junker" cars different colors. His aunt testified that, on the Friday night after he bought a green and

white Oldsmobile, he came to his grandmother's house around 11 or 12 o'clock and went to bed.

Based on this evidence, presented over four days of trial, the jury found the Defendant not guilty of felony-murder, robbery, and larceny, but guilty of premeditated first-degree murder, first-degree burglary, and assault with intent to commit rape.

The sentencing phase of the trial was much briefer, primarily because the state presented no further proof and the Defendant called only four witnesses. The first was his aunt, Gladys Green, who told how his mother and father had divorced when the Defendant was three or four years old. According to Green, the Defendant's childhood had been very unsettled. She described her nephew as "slow" and said that he had a good attitude since he had been in jail.

Harold Stoffell, a minister, testified that the Defendant had accepted the word of God, was respectful and was "the finest young prisoner I've ever saw." Edward Moore, the jailer at the Sevier County Jail, testified that he had never had any "real problems" from Defendant while he had been in jail.

Dr. Madeline Pareau, a clinical psychologist, testified that Defendant's full IQ was 78, "just a little above mentally retarded classification." She said that he had been in special education classes, where he had done well. His father, whom Pareau described as "overtly psychotic," was an alcoholic and had physically abused his mother until their divorce. According to the history given by the Defendant, his mother had started acting "quite wild" after the divorce, drinking and dating. In Dr. Pareau's opinion, Caughron had received inadequate parenting, and there had been no consistency in his relationships. His stepfather, for example, had beaten him and humiliated him for bedwetting. Dr. Pareau felt that Defendant would not be a physical threat to society or other prison inmates. On cross-examination, however, she conceded that Caughron was not insane and could conform his conduct to the dictates of the law.

■

## MOTION FOR CONTINUANCE

The Defendant first avers that the trial court abused its discretion in denying his motion for a continuance. Shortly before trial, the Defendant moved for a continuance on four grounds: (1) to take the testimony or deposition of George Tippens, an investigating officer who had moved to Florida; (2) to investigate additional suspects in the case whose names had been supplied to the defense on January 19, 1990; (3) to examine the door to the victim's bedroom; and (4) to permit FBI Agent Doug Dedrick to testify.

■ It must be clearly shown that a trial court has abused its discretion in refusing to grant a continuance before that decision will be disturbed on appeal. *State v. Melson*, 638 S.W.2d 342, 359 (Tenn.1982). No abuse of discretion warranting reversal is shown in this case.

■ Officer Tippens was one of the first officers on the scene the day the murder was discovered. The crucial evidence Defendant alleged Tippens possessed was his knowledge that there were groceries in the victim's truck when the body was discovered. This testimony, according to Defendant, would tend to show that the victim never had a chance to bring in her groceries before she died and thus was first attacked outside the house. Tippens was unable to come to trial because of a back condition. The trial court refused to continue the case because Tippens' testimony would be cumulative in light of the fact that there were several other investigating officers who should have possessed the same knowledge. At trial the Defendant elicited from Christy Jones Scott the testimony that she had unloaded two or three bags of laundry detergent from her mother's truck after she had found her mother.

■ Regarding the need to investigate persons named as suspects in certain statements given to the defense by the State on January 19, 1990, the Defendant failed to show the materiality and relevance of any evidence such an investigation would yield. The Defendant has also failed to show that a different result would have been reached if the continuance had been granted. *See Baxter v. State*, 503 S.W.2d 226, 230 (Tenn. Crim.App.1973).

■ On the allegations regarding the need to examine the bedroom door, the Defendant sought to show that the footprint on the door was larger than the Defendant's would have been. The door had been made available to the defense attorney for examination on January 26, three days before his motion. The trial court felt that the Defendant had failed to exercise due diligence in examining the door. Also, the point that Defendant wished to make, i.e., that the footprint on the door was not Defendant's, was explored during the testimony of Sandra Lee Paltorah, a forensic scientist at the T.B.I. specializing in shoe track analysis. Paltorah testified that the print on the door was consistent with a smooth-soled shoe as opposed to the tennis shoe worn by the Defendant.

■ Finally, although the trial court denied the motion for continuance on the mistaken belief that FBI Agent Doug Dedrick would testify, Agent Dedrick's testimony was presented to the jury through stipulation. When it became apparent that Dedrick would not be at trial, defense counsel expressly stated he did not want a continuance because of the stipulation. We do not find that the trial court abused its discretion in refusing to grant Defendant's motion for a continuance.

## II.

### ALLEGED T.R.CR.P. 26.2 ERROR

The Defendant avers that the trial court's denial of counsel's request for sufficient time to review the statements under Rule 26.2(d) constitutes reversible error.

The progenitor of Tennessee Rule of Criminal Procedure 26.2 is the 1957 decision of the United States Supreme Court in *Jencks v. United States*, 77 S.Ct. 1007, 353 U.S. 657, 1 L.Ed.2d 1103 (1957). In that case the Court held that defense counsel has a right to inspect prior statements or reports by a government witness, following

direct examination of the witness, to the extent that those reports or statements are related to the witness's testimony on direct examination, for the purpose of using them to prepare or conduct cross-examination. *Jencks* caused some controversy in the months after it was announced, centering on fears that it would force government prosecutors to turn over investigatory files, in their entirety, upon defense demand. To ensure against such an interpretation of the opinion in *Jencks*, the United States Congress enacted 18 U.S.C.A. § 3500, known from the time of its passage in 1957 as the Jencks Act. Its language was also incorporated into Federal Rule of Criminal Procedure 26. In Tennessee the right to inspect pretrial statements of a witness called to testify at trial, for the purpose of effectively cross-examining that witness, did not exist prior to the adoption of the Tennessee Rules of Criminal Procedure in July 1978.[1] This new production rule was initially included in Rule 16, which otherwise governs *pretrial* discovery and inspection, despite the fact that it involved "discovery" during trial and not before. Its misplacement in Rule 16 caused some confusion. *See, e.g., State v. Robinson*, 618 S.W.2d 754 (Tenn.Crim.App.1981).

In order to clarify the purpose and timing of the production of witness statements at trial, the provisions formerly contained in Rule 16(a)(1)(E) and (F) were recast as Rule 26.2 in 1984.

■ Rule 26.2(a) states: *"After* a witness ... has testified on direct examination, the trial court, on motion ... shall order the attorney ... to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter concerning which the witness has testified." [Emphasis added.] Subsection (d) states that the court *"may* recess proceedings in the trial for the examination of such statement and for prepa-

ration for its use in the trial." [Emphasis added.] The purpose of Rule 26.2 is to enable counsel to examine a witness's statements in order to test the credibility of that witness at trial. Our Court in interpreting Rule 26.2 has held that even in a capital case, the State is not required to produce witness statements until the conclusion of the witness's testimony on direct examination. *State v. Taylor*, 771 S.W.2d 387, 391 (1989). Today, for the first time, we address what constitutes a sufficient time to review Rule 26.2 statements.

It should be emphasized that this case does not involve the denial of Rule 26.2 statements. The statements here were produced the evening before direct and cross-examination took place the following afternoon. The sole issue is whether counsel was afforded a reasonable opportunity to examine the statements. The time needed for a reasonable examination is necessarily related to the length and complexity of the statements. In this case six statements, totaling 64 pages, were given to counsel for overnight study and reflection.

■ Had April Ward been the State's first witness the morning of trial and had the State produced her statements *after* her direct examination, we are of the opinion that a two hour recess would have been adequate for counsel to properly prepare for cross-examination. Here, the statements were given to counsel the night before (7:15 p.m.) and cross-examination began at approximately 5 p.m., the next afternoon just short of twenty-two hours later. We are of the opinion that defense counsel, and his defense team, were given a reasonable opportunity to examine and prepare to use the statements in cross-examining April Ward.

■ While neither state nor federal trial judges can require advance disclosure of statements, *U.S. v. Algie*, 667 F.2d 569 (6th Cir.1982) and *State v. Taylor, supra*, pros-

---

1. T.C.A. § 40–2441, enacted in 1963, permitted pretrial discovery of a confession or statement against interest made by the accused. It did not provide for the production of statements by witnesses under any circumstances. T.C.A. § 40–2044, enacted in 1968, permitted pretrial discovery of documents, photographs, and tangible objects. Under caselaw interpreting this statute, discovery of statements by witnesses other than the defendant was not permitted. *See, e.g., Hudgins v. State*, 3 Tenn.Cr.App. 148, 458 S.W.2d 627 (1970).

ecutors should nevertheless avoid needless delay by following the State's example here. We would strongly recommend early production of statements of witnesses in order to expedite the trial of the case and avoid lengthy recesses during trial. The District Attorney in this case provided defense counsel with April Ward's six statements at 7:15 p.m. on the evening before April Ward's testimony. This advance production satisfied the State's duty under Rule 26.2 and avoided the needless delay of the trial.

At 4:05 p.m. the next day, shortly before the conclusion of the direct examination of April Ward, counsel for Defendant asked the court to allow him to start his cross-examination the next morning. The trial court responded by pointing out that the defense team, consisting of attorneys Carl Ogle, Jr., Stephen Ward, and an investigator, had "had the statements overnight." The court denied counsel's request for another night in which to review the statements. The trial court wished to proceed, apparently to allow April Ward to finish her testimony that day. The court was presented with a young girl who had participated in a brutal, ritualistic-type murder, who repeatedly cried on the witness stand, and who required several recesses in order for her to regain her composure. The trial judge did not abuse his discretion by completing April Ward's testimony that afternoon.

### III.

### PHOTOGRAPHS AND VIDEOTAPE

■ The photographs and the videotape taken at the murder scene are highly probative, in that they show the condition of the body and clarify oral testimony. These depictions are certainly not pleasant, but they are not shocking or gruesome. Under *State v. Banks*, 564 S.W.2d 947 (Tenn. 1978), the trial court did not abuse its discretion in permitting their introduction.

### IV.

### INTERRUPTIONS BY THE TRIAL COURT

■ The Defendant next asserts that the trial court prejudiced Defendant's case by indicating to the jury throughout the trial that the court believed that the Defendant was guilty. The Defendant specifically complains of the trial court's interruption of his cross-examination of Christy Jones Scott and of Officer Sam Owenby, both of which interruptions were apparently attempts to keep the examination moving along; and of the court's statements during the cross-examination of Dr. Cleland Blake that what the doctor had told the jury was "just what he's told them" and that questions about why the doctor took fingernail clippings were academic and the answer obvious to anyone who had watched the television show *Quincy*. The Defendant also challenges comments by the court during the direct examination of T.B.I. scientist Robert E. McFadden to the effect that the record was "full of proof" that the bedroom door had been knocked off its hinges. This last statement was incorrect; but the proof elsewhere, including the photographs and McFadden's subsequent testimony as well as the court's own comments, made the mistake patent to the jury so that the Defendant could not have been prejudiced by the misstatement.

Finally, Defendant complains that the judge told the jury that they did not have to look at Ogle's boot and a full-scale photograph of the footprint on the door when these items were passed as exhibits. The Defendant says that the court was disparaging the Defendant's evidence. The record reveals, however, that the court was in the habit of telling the jurors that they did not have to look at potentially distasteful physical evidence, such as the cloth that had bound the victim, when it was passed to them. The boot comment was one episode of this behavior.

■ It is axiomatic that a trial judge should exercise care not to express any thought that might lead the jury to infer that the judge is in favor of or against the defendant in a criminal trial. *Brooks v. State*, 187 Tenn. 67, 213 S.W.2d 7, 10 (1948). While we caution restraint in a trial court's interjections and comments

during trial, in the overall context of this case, the trial court's behavior in the cited instances did not so clearly violate the mandate of impartiality as to infringe upon the Defendant's right to a fair trial. Furthermore, no prejudice has been shown. We find no reversible error. *See State v. Jenkins,* 733 S.W.2d 528, 532 (Tenn.Crim.App. 1987); *State v. Howell,* 698 S.W.2d 84, 86–87 (Tenn.Crim.App.1985); *State v. Hardin,* 691 S.W.2d 578, 581 (Tenn.Crim.App.1985).

## V.

### DR. BLAKE'S TESTIMONY

■■■■ The Defendant next argues that Dr. Blake was not qualified to characterize the injuries on the victim's back as "whipping marks" and those on her buttock as a slap injury. The admission of expert testimony is largely in the discretion of the trial judge. *Arterburn v. State,* 216 Tenn. 240, 391 S.W.2d 648, 655 (1965); *State v. Taylor,* 645 S.W.2d 759, 762 (Tenn. Crim.App.1982). Dr. Blake was a board certified forensic pathologist in practice in that field since 1963. He had conducted 2500 forensic investigations. The trial court did not abuse its discretion in allowing Dr. Blake to give his opinions on what had caused these injuries. *See, e.g., Bryant v. State,* 539 S.W.2d 816, 819 (Tenn.Crim.App.1976).

## VI.

### STATEMENTS MADE BY VICTIM

■■■■ The Defendant insists that certain testimony of April Ward and her mother, Lettie Cruze, concerning statements made by the victim was inadmissible hearsay. The first such testimony objected to by Defendant was that of April Ward, to the effect that she was upset with Jones because of a conversation that Jones had had with her mother; that she was mad at Jones because "no one approved of us on the porch"; and that she hurt Jones because she hated her for going to her mother and trying to separate her from the Defendant. The trial court rejected the Defendant's hearsay objections on the grounds that any statements of the victim

described by Ward were not offered for their truth but to show Ward's state of mind and what provoked her to harm the victim. We are in agreement with the conclusion of the trial judge that Ward's testimony, as it related to the victim's statements, was not hearsay inasmuch as it was not offered to prove the truth of the matter asserted. *See* T.R.E. § 801(c); *State v. Coker,* 746 S.W.2d 167, 173 (1987).

■■■■ Defendant's next objection was to the testimony of April's mother that the victim had told her that as a rule she did not get involved in other people's affairs but that she thought "April was a sweet little girl and she didn't trust Gary Caughron." Informing the jury that "[t]rue or untrue, you may consider that this conversation took place," the trial court overruled Defendant's objection. Again, the import of this testimony was that the conversation between April's mother and the victim occurred, not that the victim's statement was true. No hearsay was involved. The trial court did not err in admitting the testimony.

## VII.

### COMPETENCY OF WARD TO TESTIFY

■■■■ Defendant argues that the failure of the trial court to ask April Ward whether she understood the difference between telling the truth and a lie and whether she comprehended the importance of telling the truth rendered the competency evaluation conducted before she testified inadequate. Prior to trial, the court granted the Defendant's request for a competency hearing as to Ward, then seventeen, because she was a juvenile. At the hearing, the trial judge asked Ward some general questions, some questions about how she was doing in school and how her counseling was proceeding, and some questions about her awareness of her testimony. He then declared her competent to testify.

■■■■ Under T.R.E. 601, *see also* T.C.A. § 24–1–101, no one is automatically barred from testifying simply because of

age or mental status.[2] So long as a witness is of sufficient capacity to understand the obligation of an oath or affirmation, and some rule or statute does not provide otherwise, the witness is competent. The question of competency is a matter for the trial court's discretion. *Arterburn v. State, supra,* 391 S.W.2d at 657; *State v. Braggs,* 604 S.W.2d 883, 886 (Tenn.Crim. App.1980); *State v. Nelson,* 603 S.W.2d 158, 168 (Tenn.Crim.App.1980). The court did not abuse its discretion here.

## VIII.

### LEADING QUESTIONS

■ The Defendant avers that the trial court erred in allowing the prosecution to ask leading questions of April Ward on direct examination. The State asserts that this issue should be treated as waived because, as the State correctly points out, the Defendant has failed to cite to the location in the record of the specific questions of which he complains. Our examination of the record shows at least five occasions when Defendant objected to the State's questioning of Ward as leading.

Some of the questions objected to were leading, some were not. T.R.E. 611(c) provides that "[l]eading questions should not be used on the direct examination of a witness except as to develop testimony." In D. Paine, *Tennessee Law of Evidence,* § 611.6 (2nd ed. 1990), the writers suggest that leading questions may be used to shorten the time needed for a witness to testify or to facilitate the direct examination of a young or otherwise impaired witness. Ward was a young and highly emotional witness and at times it was necessary to lead her "to develop" her testimony. Furthermore, there was no reversible error, if any, in failing to sustain the Defendant's objections since prejudice is not clearly shown. *See Hale v. State,* 198 Tenn. 461, 281 S.W.2d 51, 58 (1955); *Mothershed v.*

*State,* 578 S.W.2d 96, 99 (Tenn.Crim.App. 1978).

## IX.

### JIMMY HUSKEY'S TESTIMONY

■ Defendant challenges the admissibility of Huskey's testimony that in 1986 the Defendant listened to hard rock music, drew sketches of "demons and stuff" like that on record album covers, had a pool stick that broke down into three pieces, had a light-colored tablecloth or curtain material in the back of his car, talked about tying up women during sex and told Huskey that slapping women "on the butt really turned him on." The State asserts, correctly under T.R.A.P. 3(e), that all of these alleged errors except that involving the Defendant's drawings of demons have been waived because of the failure to raise them in the motion for new trial.

■ The Defendant argues that the evidence about his purported drug use, sexual practices, attachment to rock music, and drawing pictures of demons is evidence of other crimes, wrongs or acts, prohibited by T.R.E. 404(b). He also contends that this evidence was irrelevant. The testimony concerning the pool stick, the table cloth material, and slapping women on the buttocks was relevant to connect Defendant to this crime and corroborate the accomplice's testimony. The testimony involving drug use, "satanic" sketches and listening to rock music, while corroborating statements made by the accomplice, should not have been admitted but there is no harmful error under the facts of this record since April Ward's testimony had already presented these features of the Defendant's character.

## X.

### LETTIE CRUZE TESTIMONY

■ The Defendant further complains that the trial court erred in admitting testi-

**2.** T.C.A. § 24–1–101 was repealed in 1991 (Caughron was tried in 1990). Also, the language of T.R.E. 601 ("Every person of sufficient capacity to understand the obligation of an oath or affirmation is competent to be a witness except as otherwise provided in these rules or by statute.") has since been changed to "Every person is presumed competent to be a witness except as otherwise provided in these rules or by statute."

mony by Lettie Cruze that around the time of the murder, her daughter, April Ward, was having trouble in school and crying a lot. He also objects to Cruze's testimony that the Defendant "sneaked around" her house for some period of time after the murder. We find no error, although the relevance of this evidence is marginal. Testimony about April's emotional reaction to the murder tends to bolster her credibility, as does testimony about her continued contact with the Defendant.

## XI.

### RECALL OF CHRISTY SCOTT

Over the Defendant's objection the trial court allowed the State to recall the victim's daughter, Christy Jones Scott, to testify that her mother owned a collection of shot glasses and a pink Oral B toothbrush. The evidence was relevant because of Ward's testimony about drinking the victim's blood from a shot glass and Cruze's testimony about the Defendant's pink toothbrush. Allowing the recall of a witness is left to the sound discretion of the trial judge, whose decision will only be disturbed upon a showing of abuse of discretion. *State v. Hartman,* 703 S.W.2d 106, 116 (Tenn.1985); *Lillard v. State,* 528 S.W.2d 207, 212 (Tenn.Crim.App.1975). There was no abuse of discretion here.

## XII.

### ATTEMPTED SUICIDE

The Defendant complains that the court should not have allowed TBI Agent David Davenport and Detective Kenny Bean to testify about Defendant's attempted suicide because information about the attempt was part of a statement made by the Defendant but not supplied to the defense as required by T.R.Cr.P. 16(a)(1)(A). Agent Davenport did not testify about the attempted suicide. There is therefore no merit to this part of the issue. Detective Bean did testify that on August 25, 1988, when he asked Defendant why he attempted to kill himself after Davenport had initially talked with him about Jones's murder, Defendant replied that he was de-

pressed and had a lot on his mind. The proof is ambiguous as to whether the State gave Defendant this statement under Rule 16. The State asserts that it did. It is not clearly established in the record that the State violated Rule 16(a)(1)(A); but, if the State did violate the Rule, the Defendant has not shown any actual prejudice caused by failure to comply with the discovery order which would require exclusion of this evidence. *See State v. Payne,* 791 S.W.2d 10, 16 (Tenn.1990); *State v. James,* 688 S.W.2d 463, 466 (Tenn.Crim.App.1984).

## XIII.

### QUALIFICATIONS OF TWO JURORS

The record shows that juror Jerry McGill was related to State's witness John Brown by marriage. Brown was a patrolman with the Sevier County Sheriff's Department who had investigated the Defendant when he received a call on July 13, 1987, about Defendant's car being in a ditch. At trial, he testified that the Defendant appeared nervous and had a small cut on his face. Although the trial court told defense counsel that he could explore this situation "later at a proper time," counsel never did so.

The second episode occurred when State's witness Tom Diddly recognized one of the jurors as the owner of the wrecker service that had towed Defendant's car when the witness worked on it. Again defense counsel indicated he would address any problem later but apparently failed to do so. Where a juror is not legally disqualified or there is no inherent prejudice, the burden is on the Defendant to show that a juror is in some way biased or prejudiced. *Bowman v. State,* 598 S.W.2d 809, 812 (Tenn.Crim.App.1980); *see also State v. Taylor,* 669 S.W.2d 694, 698–700 (Tenn. Crim.App.1983). Defendant has not done this and we find no error.

## XIV.

### JUROR'S COMMENTS

The Defendant avers that the trial court erred in not declaring a mistrial because of a juror's comments. During

cross-examination of April Ward, when defense counsel asked Ward why she had lied to law enforcement officers regarding whom she had told about the crime, a juror whispered loudly, "What's the difference?" No further mention was made of the episode until the next morning, when counsel indicated he would like to address it later that day; but no action was taken until just before the jurors began deliberations, when Van Helton, counsel's assistant, testified that the juror who had made the statement was Roy Hodge, an ex-constable, and that his manner was aggravated and "put out." Because there were questions about the juror's objectivity and the Defendant was at "enormous risk," the court removed the juror. Defendant requested no further action and did not request the court to declare a mistrial. The State asserts that the Defendant waived this issue.

■ If the issue is not considered waived, there is no indication in the record and no reason to believe that the jurors who remained were prejudiced against the Defendant by the juror's remark, which was a comment upon counsel's repetitive questioning not upon the merits of the case. In the absence of proof to the contrary, it is assumed that all of the jurors who rendered the verdict were impartial and qualified and that a mistrial was not warranted. *See Graves v. State*, 489 S.W.2d 74, 81 (Tenn.Crim.App.1972).

## XV.

### TRIAL JUDGE'S ACTIONS

■ The Defendant next avers that the trial court erred in unduly restricting his direct examination of T.B.I. Crime Laboratory personnel. The Defendant specifically cites to interruptions by the court occurring during defense counsel's direct examination of Robert McFadden, a fingerprint expert from the T.B.I. lab, who was Defendant's first witness. The defense sought to show that, despite a thorough and meticulous investigation, there was absolutely no evidence connecting Defendant with the crime scene. When defense counsel appeared to be developing this theory by an unnecessarily detailed examination of the

forensic scientist, the trial court began interrupting to curtail what it considered irrelevant and unnecessary testimony. The court urged the defense counsel to move along by directing the examination to the evidence that was material and important for the jury to consider.

■ It is well-settled that the propriety, scope, manner and control of the examination of witnesses is a matter within the discretion of the trial judge, subject to appellate review for abuse of discretion. *State v. Elliott*, 703 S.W.2d 171, 176 (Tenn. Crim.App.1985). The court in the present case, however, was unusually active in directing the form that questioning should take. The most serious episode of interjection occurred when the trial judge literally took over the questioning of the witness. Another interjection concerned McFadden's examination regarding whether the door was knocked off its hinges and has already been addressed in Section IV. A further complaint involves a bench conference at which the court urged the Defendant to get to the point before he exhausted the patience of the court and jury.

The trial judge's actions were unnecessary but did not deprive Defendant of a fair trial or prejudice him in any way. *See, e.g., State v. Jenkins, supra*, 733 S.W.2d at 532; *Pique v. State*, 480 S.W.2d 546, 550–551 (Tenn.Crim.App.1971). Defendant was not precluded from developing his theory, although it was not done in the detailed, point by point manner his counsel preferred; and the court did not prohibit any testimony that was shown to be relevant. Furthermore, the court's actions did not reflect the trial court's views on the Defendant's innocence or its opinion of the merit of Defendant's proof. We find no reversible error in the court's conduct during McFadden's testimony.

## XVI.

### IN CAMERA INSPECTION OF THE STATE'S FILE

Defendant filed a pretrial motion for the court to conduct an in camera inspection of

the State's entire files, as well as the files of any agencies or individuals that had investigated the case for the State, and to determine if the State had failed to hand over anything that might be vital to the preparation of the defense. The court was also requested to have copies of all these files sealed and filed for any appeal. At the beginning of trial the Defendant asked the court to inspect the files in camera to look for any possible exculpatory evidence. The court refused and pointed out that the district attorney general was aware of his ethical duties and stated that the court would look at anything the Defendant called to its attention but would not "plow" through all the files and evidence.

■ Despite assertions that he had been informed that the State had failed and refused to disclose certain material, Defendant never requested the court to examine any specific document or evidence. The record does not support any allegation that the State has failed to comply with its duties under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), or Rule 16, T.R.Cr.P. The trial court did not abuse its discretion in refusing to examine the State's files. *State v. Daniel*, 663 S.W.2d 809 (Tenn.Crim.App.1983), cited by Defendant, only indicates that an in camera inspection is necessary once it has been shown that there is material producible under Rule 16, in that case *Jencks* material.

## XVII.

### BENCH CONFERENCES

Defense counsel repeatedly asked to approach the bench prior to the testimony of certain State's witnesses to present motions *in limine* objecting to the admission of matters that might potentially come out during the witnesses' testimony. These were objections ordinarily made when and if the potentially objectionable testimony occurred. After allowing the Defendant to approach the bench prior to the testimony of Dr. Cleland Blake, April Ward, Jimmy Lynn Huskey, and Lettie Marie Cruze, when the State called witness Robert Yoakum, and defense counsel again approached the bench, the trial court refused

to continue to "pre-review" the testimony, told defense counsel to object to questions as they were asked, and promised that it would then rule on the objections.

■ With a few exceptions, *see, e.g.*, Tenn.R.Evid. 608 and 609, the trial court is given broad discretion in the timing of its decisions on the admissibility of evidence. D. Paine, *Tennessee Law of Evidence*, § 103.3 (2d ed. 1990). The trial court also has broad discretion in controlling the course and conduct of the trial. *Pique v. State, supra*, 480 S.W.2d at 550–551. Defense counsel was in effect asking the court as a regular practice, to speculate on the admissibility of evidence, without any idea of the context in which the evidence would be presented. The trial court did not abuse its discretion in requiring the Defendant to object when questions were actually asked.

## XVIII.

### STATEMENT OF KENNY PHILLIPS

■ The Defendant alleges that the trial court erred in refusing to allow introduction of an extrajudicial statement made by one Kenny Phillips, an inmate at one of the state prison facilities, who was called as a witness for the defense. Phillips had given a statement to law enforcement officials on July 15, 1987, in which he stated that two persons, a man and a woman who were not the defendant and April Ward, had approached him about robbing and killing a woman in Pigeon Forge, possibly the victim Dorothy Ann Jones, although Phillips did not give the woman's name. The defendant also took a statement to this effect from Phillips.

When the time came for Phillips to testify, he refused because, he said, his earlier statements were lies concocted to get a reward offered for any evidence that would help solve Jones's murder. Phillips seemed to think that by testifying he would be risking a charge of perjury. Even though the trial court explained to him that as long as he testified truthfully he would not be committing perjury, Phillips refused to tes-

tify. The trial court held him in contempt. Defense counsel then argued that he should be allowed to read Phillips' previous statements into evidence because Phillips was "unavailable" under T.R.E. 804. Noting that the statements were admitted falsehoods, the trial court refused to allow their introduction.

The Defendant asserts on appeal that the statements should have been admitted because of constitutional considerations and cites *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), and F.R.E. 804(b)(5). *See also* Tenn. R.Evid. 804, Advisory Commission Comments. The hearsay statements sought to be admitted, however, bore none of the "persuasive assurances of trustworthiness" present in *Chambers, see* 410 U.S. at 302, 93 S.Ct. at 1048–1049 (confession made spontaneously to a close acquaintance soon after murder, corroborating evidence present, statement was self-incriminatory and unquestionably against interest). The Defendant asserts that Phillips' recantation is a lie, pointing out that no reward was being offered on July 15, 1987. With nothing more to go on than these allegations, the trial court did not err in excluding the statements.

### XIX.

### UNDUE EMPHASIS TO AGGRAVATING CIRCUMSTANCE

At sentencing the trial court instructed as an aggravating circumstance: "The defendant allowed the victim to be treated with exceptional cruelty during the commission of the offense." This is not a statutory aggravating circumstance although it is similar to the circumstance in T.C.A. § 39–13–204(i)(5) [previously § 39–2–203(i)(5) ]. After a recess, during which the jury went to lunch, the judge informed counsel that after reflection he had concluded that he should change the charge to conform more to the language of T.C.A. § 39–2–203(i)(5) requiring torture or depravity of mind and should define "cruel," "torture" and "depravity." Defense counsel did not object to a corrected charge. The jury, which had not begun delibera-

tions, was called in; and the trial judge informed them that he was striking the charge on the first aggravating circumstance and inserting in place of it the instruction that "[t]he murder was especially cruel in that it involved torture or depravity of mind." The court next defined "cruel," "torture" and "depravity" in accord with *State v. Williams,* 690 S.W.2d 517, 529–530 (Tenn.1985). Defense counsel then requested that the court also tell the jury that it had not changed the instruction simply to draw attention to that factor. The court therefore specifically instructed the jury that it had acted, not to emphasize that part of the charge, but to "comport exactly" with the law. There is no merit to Defendant's assertion that the trial court's actions drew undue attention to this part of the charge.

### XX.

### CLOSING ARGUMENT

The Defendant avers that the trial court erred in not permitting him to make the final closing argument at sentencing. The statute, T.C.A. § 39–13–204(d), specifically grants the State the right of closing. This Court has previously found this issue meritless. *See State v. Melson,* 638 S.W.2d 342, 368 (Tenn.1982), *cert. denied,* 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983).

### XXI.

### DEATH QUALIFIED

The Defendant argues that questioning jurors about their beliefs on the death penalty biases the jury toward a finding of guilt and acceptance of the death penalty in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, §§ 8 and 9, of the Tennessee Constitution. Both this Court and the United States Supreme Court have rejected this and similar arguments. *See Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); *State v. Coker,* 746 S.W.2d 167, 171 (Tenn.1987); *State v. McKay,* 680 S.W.2d 447, 450, 453–455 (Tenn.1984).

## XXII.

### PROPOSED INSTRUCTION

 We find no error with regard to the trial court's refusal to instruct the jurors that they should presume that the sentence they assess will actually be carried out—that if a life sentence is imposed, a life sentence will be served and, likewise, that if the death penalty is assessed, the Defendant will be executed. This proposed instruction was rejected by the Court in *State v. Payne*, 791 S.W.2d 10, 21 (Tenn. 1990), and *State v. Melson*, 638 S.W.2d 342, 367 (Tenn.1982), cert. denied, 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983).

## XXIII.

### SUFFICIENCY OF EVIDENCE TO SUPPORT THE VERDICT

 The Defendant asserts that no evidence corroborates the testimony of April Ward, his accomplice. There is sufficient corroboration; *e.g.*, Jimmy Huskey's and Tom Bentley's testimony about the fabrics (blue terry cloth and lacy material) in the Defendant's possession; testimony of Defendant's appearance and behavior the morning after the murder; the presence of the turquoise ring at the victim's house; and Defendant's statements to his cellmates, Roy Haynes, Bobby Floyd, and Tim McGaha. *See State v. Henley*, 774 S.W.2d 908, 913 (Tenn.1989); *State v. Sparks*, 727 S.W.2d 480, 483 (Tenn.1987); *State v. Carter*, 714 S.W.2d 241, 244–245 (Tenn.1986).

## XXIV.

### SUFFICIENCY OF EVIDENCE TO SUPPORT AGGRAVATING CIRCUMSTANCE

 Citing *State v. Pritchett*, 621 S.W.2d 127, 139 (Tenn.1981), in which the victim died instantaneously from the first gunshot fired, the Defendant argues that the record does not support a finding that the Defendant tortured the victim before her death. He argues that Jones was unconscious during most of the acts that occurred that night. The proof shows that while Jones was alive and conscious, *see*

*State v. Williams, supra*, 690 S.W.2d at 529–530, the Defendant told her that she was going to die as she begged for her life. He then struck her brutally and repeatedly about her head until, according to April Ward, she no longer moved. Dr. Blake's testimony was that the head injuries would have rendered her unconscious. It was April's testimony that it was only after the victim stopped moving that the other abuse occurred. The fact that the victim was tied and gagged, however, raises a question as to whether she was really unconscious during the subsequent abuse, as does the fact that she reportedly "tightened up" when the Defendant tried to achieve sexual penetration.

In any event, the proof shows that in addition to inflicting the head injuries, the Defendant tied Ann Jones to the bed, attempted to rape her (probably anally), beat her with a pool stick, slapped her buttocks so hard that an imprint of his hand was left on her skin, gagged and strangled her, and drank her blood after smearing it on himself and his accomplice, with whom he had sex as the victim lay dying nearby. These facts undeniably satisfy the definition of depravity of mind in *State v. Williams*, 690 S.W.2d at 529, and illustrate a "consciousness materially more 'depraved' than that of any person guilty of murder." *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 1767, 64 L.Ed.2d 398 (1980).

Similar beating of a victim was held to support a finding of aggravating circumstance (i)(5) in *State v. Barber*, 753 S.W.2d 659, 668 (Tenn.1988); *State v. McNish*, 727 S.W.2d 490, 494 (Tenn.1987); and *State v. Cone*, 665 S.W.2d 87, 94–95 (Tenn.1984). In *State v. Groseclose*, 615 S.W.2d 142 (Tenn.1981), and *State v. Strouth*, 620 S.W.2d 467 (Tenn.1981), in which the victims were unconscious for part of the time, death penalties rendered under this aggravating circumstance were upheld.

In this case the proof vividly shows that this murder involved both torture *and* depravity of mind. The Defendant taunted the victim, despite her pleading, "Please don't hurt me," and told her she was going to die. The evidence fully supports the

jury's finding of the aggravating circumstance in § 39–2–203(i)(5) (1982).

## XXV.

### CONCLUSION

We find no error in the guilt phase or sentencing phase of this case. In accordance with the mandate of T.C.A. § 39–13–206(c)(1)(D) [formerly T.C.A. § 39–2–205(c)(4)], we find that the sentence of death was not imposed in an arbitrary fashion, that the evidence supports the jury's finding of the statutory aggravating circumstance, and that the evidence supports the jury's finding of the absence of any mitigating circumstances sufficiently substantial to outweigh the aggravating circumstance so found. Further, our comparative proportionality review convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the Defendant. *See State v. West,* 767 S.W.2d 387 (Tenn. 1989); *State v. O'Guinn,* 709 S.W.2d 561 (Tenn.1986); *State v. Alley,* 776 S.W.2d 506 (Tenn.1989). This is one of the most brutal and sadistic killings this Court has reviewed. We are of the opinion that this senseless, and brutal killing clearly warrants the imposition of the death penalty. We therefore affirm the conviction of first degree murder and the sentence of death. The sentence will be carried out as provided by law on the 10th day of August, 1993, unless otherwise ordered by this Court or by other proper authority. Costs are adjudged against the Defendant.

O'BRIEN and ANDERSON, JJ., concur.

DAUGHTREY, J., and REID, C.J., dissent. See separate dissenting opinion.

DAUGHTREY, Justice, dissenting.

I believe that this case should be remanded for a new trial because of unwarranted interference with the defendant's right to due process—by the police, by the prosecution, and by the trial court. Hence, I respectfully dissent from the majority opinion.

The majority's recapitulation of the evidence in this case demonstrates that the testimony of the defendant's teenaged accomplice, April Ward, was not only crucial to the state's case against Gary Caughron, it *was* the state's case against him. The FBI developed no forensic evidence implicating Caughron, despite extensive testing on fingerprints, shoeprints, blood and other fluids, and fibers. The boot print on the victim's bedroom door established that someone other than the defendant had kicked in the door. Statements that Caughron made to friends and associates were incriminating to some extent, but for the most part were brief and ambiguous. These statements certainly would not support a murder conviction in the absence of April Ward's testimony.

The police department and the district attorney's office clearly understood April Ward's significance as a prosecution witness. But, at least initially, she was not a cooperative witness. Beginning in June 1988 with the first statement she gave police, and ending with the sixth and last one she gave them in November 1988, April Ward made a total of six pretrial statements, no two of which were completely consistent with each other.

From the beginning, the police and the prosecution sought to shield April Ward and the information she had given them from the defendant's attorneys. During the course of their investigation, the police directed April Ward's mother, Lettie Cruze, not to permit April to talk with defense counsel. Because April Ward was effectively under "house arrest" during the months immediately before trial, this directive cut off any access that defense counsel might have had to this crucial witness during his investigation of the case and preparation for trial.

In response to the defendant's pretrial "*Brady* motion"—seeking pretrial disclosure of material evidence favorable to the defense—the prosecutor failed to provide defense counsel with copies of April Ward's prior inconsistent statements. And when, finally, the prosecutor turned over copies of witness statements to the defen-

dant's attorneys on the first night of trial, counsel was faced with the prospect of digesting over 100 pages, constituting the statements of 20 potential state witnesses, in the few hours before trial resumed the next morning. The next day, the trial judge refused to recess trial following April Ward's testimony on direct examination, despite counsel's representation that he had not had adequate time to review her pretrial statements and was unprepared to cross-examine her. As a result, defense counsel was not only prevented from gathering information that could have been developed from interviewing April Ward. He was also denied discovery of her statements prior to trial, and he was forced to conduct cross-examination of the state's crucial witness without the benefit of adequate preparation.

The trial court laid the blame for this predicament on the defendant's attorney. The majority here finds no error in the trial court's ruling. I conclude, to the contrary, that the combined action of the police, the prosecutors, and the trial judge operated effectively to deprive the defendant of his right to due process.[1]

Moreover, the cumulative prejudice resulting from the due process violations in this case, in which the defendant has been convicted and sentenced to death, cannot be written off as harmless error. While the defendant's lead attorney did cross-examine April Ward at trial, there is no way to measure how much more vigorous and effective his cross-examination might have been if he had been able to interview the witness in person prior to trial, or had been furnished with her prior inconsistent statements in response to his timely discovery motion, or had been given an adequate opportunity to review those statements *and* use them to prepare an effective cross-examination following her testimony on direct examination, all of which he was enti-

tled to do under state and federal law and under our rules of procedure.

To use a colloquialism that summarizes the situation most descriptively, Caughron's attorneys were effectively "stonewalled" by state officials involved in the investigation and prosecution of this case. Without any realistic gauge with which to measure the extent of prejudice to the defendant as a result of the due process violations apparent in this record, I conclude that the only appropriate relief is to grant the defendant a new trial, at which the defense will have the benefit of the discovery and disclosure that it should have had prior to and during the first trial. In reaching this conclusion, I do not wish to minimize in any way the wholly reprehensible nature of the homicide committed in this case, against an innocent and ultimately helpless victim. To insist on honoring the due process rights of the accused is an obligation imposed on courts and the judicial system by the state and federal constitutions. It in no way minimizes the heinousness of the guilty party's conduct.

## I. POLICE INTERFERENCE WITH TRIAL PREPARATION

The due process violation in this case began with a police directive to April Ward's mother, Lettie Marie Cruze, not to let April talk to the defendant's counsel during the investigatory stage of this case. It was only the first in a series of efforts to thwart defense access to information about the case.

The due process implications of government interference with a defendant's right to interview potential witnesses may best be seen as a continuum, at one end of which is the active concealment of key witnesses. When a prosecutor deliberately conceals a material witness and the defense is thereby prejudiced, a due process violation results. *See, e.g., Freeman v. State of*

---

1. The action of the police in blocking pretrial access to the state's most crucial witness and the prosecution's failure to disclose summaries of her pretrial statements are not raised as discrete issues on appeal. For this reason, it would be necessary to hold that they constitute "plain error" in order to avoid a finding of waiver on

the defendant's part and grant relief on either ground. However, they are treated in this opinion not as independent grounds for relief, but as due process violations that exacerbated the *Jencks* error in this case, making it obvious reversible error.

*Georgia,* 599 F.2d 65, 69 (5th Cir.1979), *cert. denied,* 444 U.S. 1013, 100 S.Ct. 661, 62 L.Ed.2d 641 (1980); *Lockett v. Blackburn,* 571 F.2d 309, 313 (5th Cir.), *cert. denied,* 439 U.S. 873, 99 S.Ct. 207, 58 L.Ed.2d 186 (1978).

Falling somewhere along the continuum of cases illustrating prosecutorial interference with a defendant's right of access to witnesses are those cases in which a prosecutor has instructed a witness not to talk to defense counsel. The law is well-settled that prospective witnesses do not belong to either party, and for this reason neither side should suggest that a witness refrain from talking to opposing counsel. *Gammon v. State,* 506 S.W.2d 188, 190 (Tenn. Crim.App.1973); *United States v. Matlock,* 491 F.2d 504 (6th Cir.), *cert. denied,* 419 U.S. 864, 95 S.Ct. 119, 42 L.Ed.2d 100 (1974). Of course, a witness has the right to refuse to be interviewed. *Byrnes v. United States,* 327 F.2d 825, 832 (9th Cir. 1964). Nevertheless, when the state instructs a witness not to talk to defense counsel and defendant's trial preparation is thereby hindered, or other prejudice results, due process may be violated.

For example, in *Gregory v. United States,* 369 F.2d 185 (D.C.Cir.1966), *remanded,* 410 F.2d 1016 (D.C.Cir.1969), *cert. denied,* 396 U.S. 865, 90 S.Ct. 143, 24 L.Ed.2d 119 (1969), the prosecuting attorney advised the witnesses to two robberies not to talk to anyone in his absence. The court stated:

> It is not suggested here that there was any direct suppression of evidence. But there was unquestionably a suppression of the means by which the defense could obtain evidence. The defense could not know what the eye witnesses to the events in suit were to testify to or how firm they were in their testimony unless defense counsel was provided a fair opportunity for interview. ....

*Id.* 369 F.2d at 189. The *Gregory* court, therefore, found that the state had prejudiced the defendant's pre-trial preparation and thereby deprived him of a fair trial.

In *Nichols v. State,* 581 So.2d 1245 (Ala. Cr.App.1991), the Alabama Court of Criminal Appeals reversed a conviction after the district attorney sent letters to prospective witnesses asking them not to discuss the case without a government attorney present. The court quoted *Gregory* at length, as well as *Gallman v. State,* 29 Ala.App. 264, 195 So. 768 (1940), to the effect that it is "a mistake of a serious nature for a trial court, or opposing counsel, to assume or intimate that counsel for the defendant is not at full liberty to question ... any person who knows or is presumed to know the facts [of the case]. ..." *Nichols,* 581 So.2d at 1249 (citing *Gallman,* 195 So. at 770). Based on this authority, "the serious nature of [the] case," and the witness's testimony that the prosecutor's letter influenced his decision not to talk to defense counsel, the court reversed the conviction and remanded the case for a new trial.

Another court recognized the potential for a due process violation when the state advised witnesses that they "couldn't or shouldn't" give statements to defense counsel. In *United States v. Peter Kiewit Sons' Co.,* 655 F.Supp. 73 (D.Colo.1986), a court ordered the witnesses to submit to depositions in order to cure the problem. That court noted that the witnesses were "particularly vulnerable to suggestion and anxious not to offend the prosecutors" because they were concerned that they, too, could be indicted. The court found it "grossly unfair" to permit this kind of prosecutorial misconduct, which had "unfairly hampered the defendants' investigation." *Id.* at 78. Both this case and *Gregory* are examples of courts perceiving the obvious hindrance to defense counsel's trial preparation when the state instructs witnesses not to talk.

Although instructing a witness not to talk with defense counsel may constitute a due process violation, some courts, emphasizing the requirement of prejudice, have found no constitutional error when the defendant does not appear to have been harmed by the misconduct. For example, in *Kines v. Butterworth,* 669 F.2d 6 (1st Cir.1981), *cert. denied,* 456 U.S. 980, 102 S.Ct. 2250, 72 L.Ed.2d 856 (1982), a state trooper instructed three witnesses, the cor-

rectional officers present after a prison assault, not to discuss the case with the defense attorney. However, the officers were not eyewitnesses; their testimony contained no surprises; counsel did not request a recess after the direct examinations; and cross-examination of the witnesses was thorough. The court, finding "nothing that unfairly affected or handicapped appellants in preparation for trial," held that due process was not violated because defendant could show no prejudice to his case. *Id.* 669 F.2d at 11.

In judging whether a defendant has been denied due process by the state's directive to a potential witness not to talk to defense counsel, the courts use an analysis much like that used in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), governing the right to pretrial discovery of exculpatory evidence material to the issue of the defendant's guilt, discussed further in Section II, *infra*. The defendant must show that the state withheld favorable, material evidence and that its suppression was prejudicial to the defendant's case. Courts will find prejudice, however, when defendant's pre-trial preparation is hampered by the inability of counsel to assess the credibility of witnesses. The courts also consider the other information available to defense counsel, such as pretrial statements, and they look for such indicia of prejudice as requests for recesses and poorly prepared cross-examinations. These factors contribute to what inevitably becomes a subjective assessment of the damage likely to have been done by the state's misconduct.

In this case, prejudice is clear. Unlike the government officials in *Freeman* and *Lockett*, the state prosecutor here did not physically conceal April Ward. The prosecution did, however, insist that she be kept at home and then took advantage of her vulnerability and fear of punishment by advising her mother not to let April discuss the case with the defendant's attorneys. The actual damage to defendant's trial preparation is incapable of qualitative assessment, but defense counsel's efforts to secure copies of April Ward's statement(s) prior to trial, as well as his repeated requests for time to review the statements provided to him the night before her direct examination, suggest that unlike the efforts of the attorneys in several of the cases discussed above, Caughron's counsel's efforts to defend his client were hampered by the complete lack of access to the state's crucial witness.

## II. STATE'S REFUSAL TO SUPPLY BRADY MATERIAL

Of course, the prosecution might have overcome any prejudice caused by police interference with the defendant's efforts to prepare his defense, had the state produced April Ward's various conflicting statements in response to the defendant's motion for pretrial disclosure. Although there is no general right to discovery in a criminal trial,[2] the United States Supreme Court has held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland, supra*, 373 U.S. at 87, 83 S.Ct. at 1196–97.[3] While *Brady* contemplates the suppression of many types of exculpatory evidence, the Supreme Court has specifically held that evidence impeaching a government witness's credibility may be exculpatory within the meaning of *Brady*. *See Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Likewise, in *State v. Williams*, 690 S.W.2d 517, 525 (Tenn.1985), this Court held that "when the reliability of a witness may well

**2.** *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977); *State v. Brownell*, 696 S.W.2d 362, 363 (Tenn.Crim.App.1985).

**3.** In *Brady*, the defendant requested the out-of-court statements of his companion during the murder. The government showed him all state-

ments except the one in which the companion admitted the actual killing. Although this information would not affect the conviction, the jury's knowledge of the defendant's level of participation could have affected his punishment. 373 U.S. at 84, 83 S.Ct. at 1195.

be determinative of guilt or innocence, the non-disclosure of evidence affecting his credibility may justify a new trial, regardless of the good faith or bad faith of the prosecutor." Moreover, the inconsistent statements of a witness are considered impeachment evidence favorable to a defendant. *See, e.g., United States v. Polisi,* 416 F.2d 573 (2d Cir.1969); *United States v. Shaffer,* 789 F.2d 682, 689 (9th Cir.1986). The witness to be impeached cannot, however, be one whose credibility does not affect defendant's guilt or innocence, a limitation that is clearly met in this case. *See generally United States v. Starusko,* 729 F.2d 256 (3d Cir.1984).

When asked to decide whether suppressed evidence is material, the courts have generally held that "the materiality of the withheld evidence may depend on the closeness of the case." *Carter v. Rafferty,* 826 F.2d 1299, 1308 (3d Cir.1987). *See also Boone v. Paderick,* 541 F.2d 447 (4th Cir. 1976); *United States v. Sutton,* 542 F.2d 1239 (4th Cir.1976). For example, in *Starusko, supra,* the court found that the impeachment of a "key government witness" was material because "his credibility may well be determinative of guilt or innocence.... He is the linchpin of the prosecution's case." 729 F.2d at 260–61. Thus, a reviewing court must consider the materiality of the withheld evidence in light of the other evidence presented.

A due process violation requires more than the suppression of significant exculpatory evidence, however. The Fourth Circuit noted in *United States v. Smith Grading & Paving, Inc.,* 760 F.2d 527, 532 (4th Cir.), *cert. denied sub nom. Dellinger v. United States,* 474 U.S. 1005, 106 S.Ct. 524, 88 L.Ed.2d 457 (1985) (citing *United States v. Higgs,* 713 F.2d 39 (3d Cir.1983)), that "no violation occurs as long as *Brady* material is disclosed to a defendant in time for its effective use at trial." *See also United States v. McCrary,* 699 F.2d 1308 (11th Cir.1983). In *United States v. Darwin,* 757 F.2d 1193 (11th Cir.1985), the Eleventh Circuit faced a situation in which the government had disclosed impeachment evidence after a witness had testified. Noting the conclusions of the Seventh, Tenth,

Third and Eighth Circuits, that court held that "[t]he point in the trial when a disclosure is made ... is not in itself determinative.... We agree with those circuits holding that a defendant must show that the failure to earlier disclose prejudiced him because it came so late that the information disclosed could not be effectively used at trial." 757 F.2d at 1201.

Although the complete non-disclosure of significant exculpatory evidence often makes an easy case for a due process violation, delayed disclosure requires an inquiry into whether the delay prevented the defense from using the disclosed material effectively in preparing and presenting the defendant's case. *United States v. Ingraldi,* 793 F.2d 408 (1st Cir.1986). In *Ingraldi,* by failing to move for a continuance and then thoroughly cross-examining the witness, the defense counsel cured a potential *Brady* violation. *Id.* 793 F.2d at 413. In *United States v. Enright,* 579 F.2d 980 (6th Cir.1978), the Sixth Circuit held that no due process *Brady* violation occurred because the failure to disclose material exculpatory evidence had been discovered in time for "full and adequate correction." Finally, in *United States v. Moceri,* 359 F.Supp. 431, 438 (N.D.Ohio 1973), the court reviewed an order requiring the government to show cause why it should not make a witness's prior statements available to the defense before trial. That court found that "only in the context of either a complete deprivation of discovery or resulting prejudice" does a due process violation occur. Only if the suppression prevents material exculpatory evidence from effectively being used at trial is there a due process violation. *See also United States v. Peters,* 732 F.2d 1004 (1st Cir.1984); *United States v. Higgs,* 713 F.2d 39, 44 (3d Cir. 1983); *United States v. Xheka,* 704 F.2d 974, 981 (7th Cir.1983); *United States v. McPartlin,* 595 F.2d 1321, 1346 (7th Cir.), *cert. denied,* 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979).

The record in this case indicates that despite the defendant's timely motion for disclosure, the prosecutor did not produce the inconsistent statements of April Ward,

the key witness for the state, until the night before she testified at trial. The evidence was clearly favorable to the defendant as impeachment evidence and also material to the issue of guilt, given the fact that the witness's testimony was the "linchpin of the case." Nevertheless, if defense counsel had been given an opportunity to make effective use of the material, that is, time to review those contradictory statements *and* time to prepare for April Ward's cross-examination based on what was contained in those statements, the due process problem in this case might have been avoided. Hence, both the due process violation by police in directing April Ward's mother not to let her talk to defense counsel, and the extenuation of that due process violation by the prosecutor in wrongfully withholding *Brady* material, could have been overcome in this case, had the trial court given defense counsel an adequate opportunity to review that material at an appropriate point during the trial. Unfortunately, in the name of expediency, that opportunity was not forthcoming.

### III. THE RULE 26.2 VIOLATION

The majority opinion contains a brief history of Tennessee Rule of Criminal Procedure 26.2 and its genesis in federal law, and a passing reference to *State v. Taylor,* 771 S.W.2d 387 (Tenn.1989), the only reported decision of this Court directly interpreting Rule 26.2. *Taylor,* of course, stands for the obvious proposition that on motion, "a[ ] statement of the witness ... that relates to the subject matter concerning which the witness has testified" must be "produce[d] for the examination and use of the moving party," but only *"[a]fter* [that] witness ... has testified on direct examination." Tennessee Rules of Criminal Procedure 26.2(a) (emphasis added). Hence, under Tennessee law, as under federal law, a prosecutor's refusal to produce the statements prior to direct examination cannot be held to be prejudicial error, even though it is often extolled as "the better practice." *Taylor,* 771 S.W.2d at 391. The majority then correctly identifies the question of first impression we face in this case: Given the provision in Rule 26.2(d) permit-

ting a "recess ... in the trial for the examination of such statement *and for preparation of its use in the trial"*, was counsel in this case afforded a reasonable opportunity to examine April Ward's prior statements and prepare for her cross-examination? (Emphasis added.)

Answering this inquiry in the affirmative, the majority postulates that because the defense "team" was given a copy of April's six statements "for overnight study and reflection," defense counsel had 22 hours in which to "study and reflect" on those 64 pages. In the majority's judgment, two hours would have been sufficient time to comply with the requirements of Rule 26.2. Thus, the majority concludes, the prosecution's "advance production satisfied the State's duty under Rule 26.2 and avoided the needless delay of the trial," and the trial court's decision "to proceed, apparently to allow April Ward to finish her testimony that day" was not an abuse of discretion. There was, in short, no violation of Rule 26.2 and thus no error, in the majority's view.

If this were a routine case, and if the majority's description of the problem posed for defense counsel in this case were more complete, one might not quibble with the decision to assign the matter to that legal limbo known as "trial court discretion." But this is not a routine case—it is a capital case, one in which the defendant was ultimately sentenced to execution, based entirely on the testimony of 16–year–old April Ward, an accomplice who had given police a total of six contradictory statements, all of which had been systematically withheld from defense counsel despite legitimate efforts, both informal and formal, to obtain them prior to and at the time of trial. To condone the trial court's action in the name of avoiding delay in the trial, or from some misplaced sympathy for the accomplice, is to make a mockery of the procedural guarantees expressed in our modern rules of procedure and in case law interpreting the reach of due process in criminal trials. At the very least, the majority should offer some guidance on the nature and extent of the trial court's discretion in this area of

the law and should set standards for determining when an abuse of that discretion has occurred.

### A. *The Provisions of Rule 26.2*

The majority notes that the provisions of Rule 26.2 can be traced directly to Federal Rule of Criminal Procedure 26.2, which in turn was based on the federal "Jencks Act," 18 U.S.C. § 3500 (1957), passed in response to the United States Supreme Court's opinion in *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957). In pertinent part, the Tennessee Rule reads as follows: [4]

*Production of Statements of Witnesses.—*

(a) Motion for Production. After a witness other than the defendant has testified on direct examination, the trial court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and his attorney, as the case may be, to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter concerning which the witness has testified.

\* \* \* \* \* \*

(d) Recess for Examination of Statement. Upon delivery of the statement to the moving party, the court, upon application of that party, may recess proceedings in the trial for the examination of such statement and for preparation for its use in the trial.

(e) Sanction for Failure to Produce Statement. If the other party elects not to comply with an order to deliver a statement to the moving party, the court shall order that the testimony of the witness be stricken from the record and that the trial proceed, or, if it is the attorney for the state who elects not to comply, shall declare a mistrial if required by the interest of justice....

Obviously, whether any one of these provisions has been violated and what action must be taken to correct the error can only be determined on a case-by-case basis, in context both the evidence in the record and the procedure followed at trial.

### B. *Procedural History of the Rule Violation*

The factual background of the state's case against Gary Caughron is set out in detail in the majority opinion. It points out the obvious—that April Ward's testimony not only made her the prosecution's "linchpin witness," but also constituted virtually the entire case for the state. What is not

---

**4.** As to the remainder of Rule 26.2, subsections (b) and (c) set out the procedure for determining whether the entire statement of a witness, or only part of it, is producible; subsection (f) requires application of the rule to pretrial hearings in the criminal court; and subsection (g) defines what constitutes a statement under the rule.

According to the Advisory Commission Comments:

"The language of Rule 26.2 is substantially identical to the language in Rule 26.2 of the Federal Rules of Criminal Procedure. There are, however, two other differences that deserve comment.

"First, as formerly was evident in Rule 16, the Committee deliberately did not incorporate that provision of subdivision (e)(3) of the Jencks Act, which applies to statements of witnesses before a grand jury, and such statements are not meant to be obtainable simply because a grand jury witness testifies for the State. Such statements may only be obtained under the limited provisions of existing law now contained in Rule 6(k)(2).

"Second, Rule 26.2(f) now makes it clear that this rule applies not only to trial situations, but also to pretrial testimony such as might be given at a suppression hearing. There would be little logic in requiring statement production only at trial, and not at pretrial hearings where testimony as to the facts of the case is being given under oath. This provision is similar to language found in Rule 12(i) of the Federal Rules of Criminal Procedure but the Tennessee Rules Commission elected to treat all witness statements in one rule. However, the Tennessee rule applies to all pretrial motions under Rule 12(b). Further, the Federal rule treats law enforcement officials as witnesses called by the state, but the commission elected not to adopt this provision. Obviously, Rule 26.2(c) applies to such pretrial motion hearings. Thus, only a part of a witness' statement may be relevant to the hearing. The remainder may then be disclosed at trial under the provisions of Rule 26.2(a)."

included in the majority opinion is a recitation of the procedural background of the trial, putting in context the "Jencks motion" made by defense counsel at various points during the proceedings.

The trial of this case lasted four days. The first day was consumed by arguments and rulings on unfinished pretrial business, including defense counsel's request that the trial court order early production of witness statements, and by selection of the jury. Sometime after court adjourned at 7:15 p.m., the district attorney handed defense counsel a package containing the pretrial statements of all prospective witnesses for the state, including April Ward. In the package were over 100 pages of typewritten and handwritten materials, comprising the statements of 20 different persons. Defense counsel apparently did not know until he received these documents from the prosecutor that April Ward had made six separate statements to police.

When court resumed the next morning at 9:00 a.m., the defendant's lead attorney, Carl R. Ogle, told the trial judge even before the first witness was called that he appreciated having received copies of the witnesses' statements the night before, but that he had not had a chance to review all the material that had been turned over to him. When, later that day, the state called April Ward as its fourth witness, Ogle told the trial judge that he had had time to review only one of April's statements and asked that trial be adjourned until the next morning to permit him to examine the rest of her statements before she testified. This request was denied, and April Ward's direct examination followed immediately.

Near the end of the direct examination, during a break in testimony taken to deal with an unrelated question, Ogle noted that it was 4:05 p.m.; he again reminded the trial judge that he had not had an opportunity to read all of April's prior statements; and he said, "I would ask the Court to allow me to start my cross-examination in the morning, because I am not prepared and there's no way in the world I can cross-examine this witness today." To this the trial judge responded:

No sir. You have your assistant with you, Mr. Ward. You have your [investigator] with you ... They do a lot of work for you and do good work for you and they've been doing good work for you for the last ... since about 1:30. They've been looking at that. I glanced at it. It seems to have nothing worthwhile, relevant, or germane. You've had the statements overnight. This Court will not delay it but I will tell you this, I intend to quit about 5:00. Got a new rule. It may turn my hair brown again. My complexion may return. My vigor may return. I'm going to start working about eight or ten hours a day and quit.... I've been working 10, 12, 14 hours a day for the last three weeks and I shouldn't do that. So I'm going to try to do better and if we can let's do it. I know that I can't quit before 5:00. There's no way in the world I can do it but at 5:00 I'm going to start up [sic] and quit.

The jury was brought back to the courtroom, and the district attorney continued his direct examination of April Ward. Less than ten minutes later, he completed his questioning and tendered the witness to the defense for cross-examination. Ogle, noting that it was 4:12 p.m., again asked for an overnight recess. He reminded the trial judge that he had not received the package of statements until after court adjourned the previous night. He pointed out that he and his co-counsel had had to consult with their client and his family before leaving the courthouse at 9:15 p.m. to return to Ogle's office, which was located in Jefferson City, some 40 miles away in an adjoining county. They were due back in court in Sevierville at 9:00 the next morning. Ogle said that he had turned over the package of witness statements to his investigator to review overnight, and that he had been able to read only one of April Ward's statements in the interim. He apologized to the trial judge for having to ask for a recess, and indicated that the defense had tried to avoid the delay by seeking pretrial discovery of the witnesses' statements, an effort that had proved unsuccessful. When the trial judge responded

that he was "powerless to require the Attorney General to do something the rules and the law do not require," that is, to order early production of the statements, Ogle made the following, thoroughly reasonable response:

> But you could cure that [problem] at this point by giving me the amount of time necessary to properly prepare [for cross-examination. [T]his witness is the whole case. I mean, we rise or fall here if they believe her. It's that important. I've been in your court for a long time and don't regularly ask for this and you know that, but this is a very important case. It's a very dangerous situation for this witness to step in here without [my] being properly prepared to cross-examine her. It would just be suicide.

The trial judge denied defense counsel's request for a recess on the ground that the "material is not that complex. [The statements are] not that different [from each other]." After further discussion, during which the prosecution argued against further delay, the trial judge finally allowed counsel a ten-minute recess, which actually stretched into 16 minutes. Although the record does not show the exact time that court resumed following this recess, the hour must have been very close to 5:00 p.m., which was the trial judge's previously announced adjournment time. Nevertheless, the trial judge not only forced defense counsel to begin his cross-examination of April Ward at that late hour, but he also failed to recess until cross-examination was completed, some considerable period of time later that evening.

It is clear from the record that the trial court's decision to deny a recess was not due to any misunderstanding on his part about the crucial nature of April Ward's testimony. Berating defense counsel for his repeated efforts to secure a recess, the trial judge said:

> I will give you a ten minute recess but you're going to cross-examine. But the court observes this. Before anybody came in the courthouse, before anybody got involved in this at all, even the most thickest neophyte in the world would

know that [April Ward] is the crucial witness, the devastating witness and you knew, as an experienced, seasoned lawyer, from the front, throughout and now, this is the witness and this is the witness. And so, I hold you to that standard. I'll give you ten minutes to talk with whomsoever you want to. We're going to cross-examine this lady.

Following the brief recess, the trial judge added:

> Right now your client is at enormous risk for the death penalty. At enormous, enormous risk. Your statement that you weren't ready to cross-examine, if the death penalty is imposed, and it may well be. It's a jury question. Of course, this lawsuit's half-tried, and we don't know what course it will take or what proof is to come but at this time you are in imminent peril. You have put incompetency of counsel in this record by not being diligent, by not going over these statements and by not being prepared to cross-examine this crucial and devastating witness. That's what concerns the Court but the Court cannot stop and wait and procrastinate.

Before beginning an analysis of the legal principles applicable to these facts, two observations seem pertinent, both based on a careful reading of the transcript in this case. First, there is no reasonable basis in fact for the trial court's allegation that defense counsel had not been diligent, either in his representation of his client or in the discharge of his duties as an officer of the court. The trial court found as a matter of fact that the attorney had received the witness statements at 7:45 p.m. on the first night of trial. The lawyer was due back in court at 9:00 a.m. the next morning, approximately 13 hours later, ready for trial. In that 13–hour interval, he was called upon to confer with his client, to spend the patter part of two hours driving to and from his out-of-county office, to review the day's events with his co-counsel, to prepare his opening statement for the next morning, and to tend to such personal matters as eating, sleeping, and maintaining personal hygiene. To ask in addition that he read over 100 pages of witness

statements, including 64 pages of April Ward's statements, make a study of the many inconsistencies revealed in those statements, and devise a strategy for cross-examination based on his review, is simply unreasonable. The courts already demand much of attorneys appointed to represent indigent defendants, especially those who (like Caughron) face imposition of the ultimate penalty. Their efforts are unappreciated by the public generally and undercompensated by the justice system they serve. The burden they assume is difficult, and when acting in good faith, they should be accommodated by the courts in their efforts to discharge their professional obligation to their clients.

Second, despite the trial court's assessment of the statements in question as "not that complex," "not that different" from one another, and containing "nothing worthwhile, relevant or germane," a review of April Ward's statements demonstrates clearly that they were a powerful source of ammunition with which to impeach her testimony, had defense counsel been permitted the time necessary to review them and prepare his cross-examination in light of their content.

#### C. *Analysis of Relevant Case Law Interpreting Rule 26.2*

Although, as previously noted, there have been few Tennessee cases interpreting Rule 26.2, there is a rich mine of federal case law involving the production of what is now universally referred to as "Jencks material." While federal authority is not binding on Tennessee state courts, it is obviously persuasive in resolving disputes such as the one now before us, not only because the drafters of the Tennessee rule opted to follow the federal model so closely, but also because of the thoroughness the federal courts have brought to the analysis of Jencks disputes.

Like the Tennessee rule, the Jencks Act and the federal rule require not only that the defendant be furnished with the prior statements of witnesses following direct examination, but also that defense counsel be afforded a reasonable opportunity to examine those statements and prepare for cross-examination based on their contents. Although the duty of the trial court to order a recess under subsection (d) is couched in permissive terms, the federal cases make it clear that failure to permit counsel reasonable time for review constitutes error.

For example, in a case very close on its facts to the one now before us, the prosecution turned over Jencks material to defense counsel on a Sunday morning at 10:00 a.m., preceding the start of a three-day trial the next day, Monday. The material consisted of "a stack of paper at least eight inches thick, including a thousand pages of testimony obtained from ten witnesses, a forty-five minute tape recording and other documents." *United States v. Holmes*, 722 F.2d 37, 40 (4th Cir.1983). The record reflects that "it took an experienced attorney twenty-four hours to read through this material once in preparation for this appeal." [5] *Id.*

The facts of *Holmes* bear an almost uncanny resemblance to the facts in this case:

> The government completed the direct examination of its first witness, Creta, late in the afternoon of the first day of trial. One of the lawyers for the defense requested the district court to adjourn for the day [because] ... counsel had not sufficiently completed their study of the Jencks material so as to be prepared to cross-examine. The district court ruled that ... since the Jencks material had been furnished the day before, when under a strict interpretation of the Act it need not have been furnished until the witness had completed his direct testimony, the district court would give counsel only a five-minute recess before cross-examination would begin. [Footnote: In

---

5. Likewise, it took the author of this opinion a full hour to read rapidly through the statements of April Ward, without taking notes or marking the statements for comparison purposes. A careful reading would consume much more than the two-hour estimate given in the majority opinion. A list of the contradictions in the six statements and the development of a strategy for their effective use on cross-examination would, of course, take even longer.

fact, counsel were given a sixteen minute recess. The record shows that the recess began at 4:40 p.m., and the jury did not return to the jury box until 4:56 p.m.] The requested adjournment was denied and cross-examination of Creta began. The court remained in session until the cross-examination, redirect and recross-examination of Creta was completed. The jury was excused at 6:51 p.m. and the court adjourned at 7:06 p.m.

*Id.*

The *Holmes* court held that it was "clear that defendants were not afforded a reasonable opportunity to examine and digest the mass of material furnished them on the Sunday before the Monday trial began." *Id.* at 41. The reviewing court found an abuse of discretion amounting to a violation of the defendants' rights under the Jencks Act and ordered a new trial. *Id.*

A similar error occurred in this case. When the trial judge refused to order a recess, as requested pursuant to Rule 26.-2(d)—or even more reasonably, to adjourn court for the day a mere half-hour earlier than scheduled—he did so without justification. As a result, defense counsel was forced to begin cross-examination under circumstances amounting to a deprivation of Rule 26.2 statements that were rightfully his to inspect. The majority "emphasize[s] that this case does not involve the denial of Rule 26.2 statements." But, the production of Jencks material without adequate time to read and make use of it undoubtedly constitutes the functional equivalent of a denial. In my judgment, the violation of subsection (d) in this case is so clear that the only remaining question concerns the relief that should be granted in light of this error.

As one commentator has noted, once a Jencks statement is deemed producible, "the defendant's right to the statement is virtually absolute." *Wharton on Criminal Procedure.* (13th ed.) § 378. Because the original *Jencks* opinion was founded on the United States Supreme Court's supervisory powers, and not on constitutional grounds, a denial of that right does not, *per se,* result in constitutional error. *Pal-*

*ermo v. United States,* 360 U.S. 343, 345, 362, 79 S.Ct. 1217, 1221, 1229–30, 3 L.Ed.2d 1287 (1959). The federal courts have noted, however, "that in some situations denial of production of a Jencks Act type of statement might be a denial of a Sixth Amendment right." *United States v. Augenblick,* 393 U.S. 348, 356, 89 S.Ct. 528, 533, 21 L.Ed.2d 537 (1969). Hence, courts have suggested that both the Sixth Amendment's right to compulsory process, *Id.,* and the right to confrontation are implicated in the violation of the procedural guarantees of Rule 26.2. *Krilich v. United States,* 502 F.2d 680 (7th Cir.1974). As to the latter right, the United States Court of Appeal has noted:

> Clearly, the principal purpose of requiring the government to disclose prior written statements of a witness which relate to that witness' direct testimony is to facilitate cross-examination. It is principally through cross-examination that a defendant exercises his right to confront witnesses called to testify against him. Conversely, the failure to provide material to which the defense is entitled under the Jencks Act may adversely affect a defendant's ability to cross-examine a government witness and thereby infringe upon his constitutional right of confrontation.

*Krilich, supra,* at 682 (holding that a Jencks violation "presents an issue of sufficient constitutional dimension to warrant consideration under 28 U.S.C. § 2255").

Moreover, it has been held that the failure of an attorney to seek a recess for the purpose of reviewing recently proffered Jencks material (instead the defense attorney tried to read through the documents while direct examination was in progress) constitutes ineffective assistance of counsel, yet another Sixth Amendment deprivation. *United States v. Hinton,* 631 F.2d 769, 771, 778–780 (D.C.Cir.1980). The *Hinton* court faulted the attorney for failing to seek "adequate time to make an informed tactical decision as to the use of the information contained in the [statements]," thereby producing "a harried trial attorney, attending to direct examination with one part of her consciousness, and with the

other rifling through the 'massive Jencks material' ... in a hurried attempt to isolate and scan the relevant documents." *Id.* at 778. In *Hinton,* the defense attorney was "harried" through her own fault, while in this case counsel was "harried" by the action of the trial court. The cause may be different, but the result is the same. Here, as in *Hinton,* counsel's conduct was not "the product of deliberate and informed decision" but is marked by "inadequate preparation," resulting in the deprivation of the defendant's right to the effective assistance of counsel. *Hinton, supra,* at 780.

Such a deprivation violates the right-to-counsel provision found in Article I, Section 9 of the Tennessee Constitution, as well as the Sixth Amendment of the federal constitution. *See generally Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn.1975). This constitutional violation is made all the more egregious by the fact that the trial court took note that it was imminent, but did nothing to prevent it.[6] Whatever value there is in maintaining efficiency in the trial of criminal cases (and it is considerable under normal circumstances), efficiency must be assigned a low priority where procedural rights of an accused are at stake. In this case, the trial judge's misguided decision not to adjourn court before 5:00 p.m., regardless of the circumstances, amounts to an arbitrary and capricious abuse of discretion, resulting in the necessity of retrial. Put simply, the price of saving less than a half-hour of trial time turned out to be "penny wise but pound foolish."

For there can be no dispute, given the facts of this case, that the error committed by the trial court was prejudicial. Federal case analysis on this point is compelling. The United States Supreme Court held early on that a *Jencks* violation could be considered harmless error. *Palermo, supra,* at 355–6, 79 S.Ct. at 1226–7. But in the

wake of this initial ruling, the Court has set the threshold for determining harmlessness at a very high level. For example, in *Clancy v. United States,* 365 U.S. 312, 81 S.Ct. 645, 5 L.Ed.2d 574 (1961), the Court said:

> Since the production of at least some of the [Jencks] statements was a right of the defense, it is not for us to speculate whether they could have been utilized effectively. As we said in *Jencks v. United States:* "Flat contradiction between the witness's testimony and the version of events given in his reports is not the only test of inconsistency. The omission from the reports of facts related at the trial, or a contrast in emphasis upon the same facts, or even a different order of treatment, are also relevant to the cross-examination process of testing the credibility of a witness's trial testimony."

*Clancy,* at 316, 81 S.Ct. at 648 quoting *Jencks, supra,* at 667, 77 S.Ct. at 1012–13 (citations omitted).

Building on its ruling in *Clancy,* the United States Supreme Court noted in *Goldberg v. United States:*

> Since courts cannot "speculate whether [Jencks material] could have been utilized effectively" at trial, ... the harmless-error doctrine must be strictly applied in Jencks Act cases.

425 U.S. 94, 111, note 21, 96 S.Ct. 1338, 1348, note 21, 47 L.Ed.2d 603 (1967). The *Goldberg* court cited with approval Justice Brennan's dissenting opinion in *Rosenberg v. United States,* 360 U.S. 367, 373, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959):

> Although we need not go so far as those courts which have suggested that the harmless error doctrine can never apply to statements producible under the statute, ... fidelity to the principle underly-

---

6. Following the conclusion of April Ward's testimony, the trial judge attempted to rescue defense counsel from a later charge of ineffectiveness by commenting on the fact that Ogle had been handed "yellow sheets" of "check lists" by his investigator and noting, "I find counsel's assistance has been full, complete, meticulous as reflected by the questions put, as by the notes you should retain in case some question is raised at some later time about competency of counsel." Of course, no post-hoc pronouncement of competency by the trial court can make up for the fact that counsel was hobbled in his representation of Caughron by the denial of his motion for a Rule 26.2(d) recess.

ing Jencks and the Jencks statute requires that when the defense has been denied a statement producible under the statute, an appellate court should order a new trial unless the circumstances justify the conclusion that a finding that such a denial was harmful error would be clearly erroneous. In that determination, appellate courts should be hesitant to take it upon themselves to decide that the defense could not have effectively utilized a producible statement.

Thus, federal law permits the courts to overlook Jencks violations only in the narrowest of circumstances:[7]

> The requirements of the Jencks Act are intended to provide defendants in federal prosecutions with an opportunity for thorough cross-examination of government witnesses, making the constitutionally guaranteed right of confrontation more meaningful. Violations of the statute are necessarily attended by the danger that this precious right will be impaired. For this reason, and also because it is ordinarily difficult upon review of a cold record to ascertain the value to the defense of a statement withheld, *violation of the [Jencks] Act is excused only in extraordinary circumstances. Unless it is perfectly clear that the defense was not prejudiced by the omission, reversal is indicated.*

*United States v. Missler,* 414 F.2d 1293, 1303–1304 (4th Cir.1969) (citations omitted) (emphasis added). *Accord, United States*

*v. Winner,* 666 F.2d 447, 448–449 (10th Cir.1981); *United States v. Knowles,* 594 F.2d 753, 755 (9th Cir.1979); *United States v. Aaron,* 457 F.2d 865, 869 (2nd Cir.1972).

Given the centrality of April Ward's testimony, the inherent unreliability which attaches to that testimony by virtue of the half-dozen contradictory statements she made over a five-month period prior to trial, and the trial court's failure to grant counsel a reasonable period of time in which to capitalize upon those various pretrial statements, it appears that the Rule 26.2(d) error in this case was prejudicial. Moreover, appellate judges are in a poor position to second-guess counsel on the question of whether a recess to permit full utilization of the statements in this case would have been efficacious. It should be noted, however, that perhaps the most ghoulish aspect of April Ward's testimony, to the effect that she and Caughron drank the victim's blood out of shot-glasses as she lay dying nearby, nowhere appears in any of Ward's prior statements,[8] a fact of which counsel may have been totally unaware,[9] since he had not had an adequate opportunity to read and compare all the statements.

It is true that defense counsel engaged in a vigorous cross-examination of April Ward, confronting her repeatedly with the fact that she had made contradictory statements to police. But, he did not cross-examine her with regard to the details of

---

**7.** The federal courts have held a Jencks violation harmless only where the statement and the witness's testimony are consistent, *United States v. Tashjian,* 660 F.2d 829 (1st Cir.1981); where the statement is of marginal value, because the witness is not an integral part of the government's case, *United States v. Weidman,* 572 F.2d 1199 (7th Cir.1978); where the statement contains only cumulative material, *i.e.,* it is the same as the information in grand jury transcripts that have already been disclosed, *United States v. Anthony,* 565 F.2d 533 (8th Cir.1977); where lost notes would have supported the prosecution's case, *United States v. Miranda,* 526 F.2d 1319 (2nd Cir.1975), cert. denied 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82; or where the statement is not exculpatory and there was no advantage to the government in non-production, *United States v. Principe,* 499 F.2d 1135 (1st Cir.1974). At least one state court has applied harmless error analysis to the violation of pro-

duction rule. In *State v. Tanner,* 175 W.Va. 264, 332 S.E.2d 277, 279 (1985), the Court held: "The question of whether the error was harmless or prejudicial hinges upon whether there was a substantial discrepancy between the contents of the prior statement or report and the witness's testimony during trial."

Obviously, the error in this case could not be considered harmless under any of the foregoing formulations.

**8.** And, no bloody shot-glasses were found at the scene of the crime.

**9.** There is no way to know to what extent this aspect of April's testimony may have affected the jury's decision to impose the death penalty. The record reflects that the state relied on it in arguing aggravating circumstances during the penalty phase of the proceedings.

those statements, perhaps as a matter of strategy, but more likely from ignorance of their contents. It is this latter possibility that should lead this Court to hold that the trial court's denial of counsel's request for a recess or a reasonable time to review the statements under Rule 26.2(d) constitutes reversible error.

Finally, it must be emphasized that the majority's calculation that defense counsel had *22 hours* in which to "study and reflect on the pretrial statements of April Ward" (and some 20 other witnesses) is purely illusory. It fails to take into account the fact that almost half this period of time, nine hours, was spent in court during the course of the trial. It makes no provision for two hours of travel, for time that the attorney spent consulting with his colleagues and his client, for time devoted to planning trial strategy for the next day (including opening argument), or for a reasonable period of time for rest and sustenance. The trial judge and a majority of this court apparently expect defense counsel to be able to prepare cross-examination from notes taken by an investigator (notes which the lawyer and the investigator may not have had a chance to discuss) while trial is actually in progress. Had the attorney done *voluntarily* what he was forced to do by the trial court in this case, there can be little doubt that he would be subject to a charge of incompetency and found to have rendered ineffective assistance of counsel—much like the attorney in *United States v. Hinton, supra,* who opted to review a witness's statement while direct examination of that witness was being conducted.

The physical and psychological demands on an attorney in trial, especially a criminal trial involving a capital offense, are heavy. The expectations placed on defense counsel in this case were completely unrealistic, and they resulted in a deprivation of due process with respect to his client. For the reasons set out above, I dissent from the majority's decision to affirm the defendant's conviction in this case.

I am authorized to say that Chief Justice REID joins in this opinion.