# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT JACKSON

## JANUARY SESSION, 2000

STATE OF TENNESSEE,    *

      Appellee,    *    No. W1999-01441-CCA-R3-CD

            *    SHELBY COUNTY

vs.    *

            *    Hon. Joseph B. Dailey, Judge

GREGORY AUSTIN,    *

      Appellant.    *    (First Degree Murder)

**FILED**

March 8, 2000

Cecil Crowson, Jr.
Appellate Court Clerk

For the Appellant:

**Walker Gwinn**
Asst. Public Defender
201 Poplar Avenue
Memphis, TN 38103

**AC Wharton**
District Public Defender

For the Appellee:

**Paul G. Summers**
Attorney General and Reporter

**J. Ross Dyer**
Assistant Attorney General
Criminal Justice Division
425 Fifth Avenue North
2d Floor, Cordell Hull Building
Nashville, TN 37243-0493

**William L. Gibbons**
District Attorney General

**Lee Coffee and Jennifer Nichols**
Asst. District Attorneys General
Criminal Justice Complex, Suite 301
201 Poplar Avenue
Memphis, TN 38103

OPINION FILED: _____

AFFIRMED

**David G. Hayes,** Judge

**OPINION**

The appellant, Gregory Austin, appeals his jury conviction for first degree premeditated murder. The appellant was originally indicted for felony murder in the perpetration of attempted robbery and first degree premeditated murder. Because the State did not seek a sentence of death or life without parole, the trial court imposed a life sentence. On appeal, the appellant argues the trial court erred in failing to: (1) suppress the appellant's statement to the police; (2) permit redaction of portions of appellant's statement to the police prior to its admission; and (3) contemporaneously instruct the jury regarding prior inconsistent statements.

Following our review, we affirm the judgment of the trial court.

BACKGROUND

On the afternoon of October 28, 1996, Tony Price drove his friend Michael Ryan to the grocery store and the liquor store. The two men returned to Ryan's home at 616 Jeanette Place, a multi-family dwelling, around 8:00 p.m. Ryan took the packages into his residence while Price remained near his vehicle, a green Cadillac. While Ryan and his wife finished unloading the groceries, one of Ryan's neighbors informed him that his friend Price had been shot. Ryan ran down the stairs and found Price lying beside the vehicle barely conscious. Price's pockets were turned inside out.

When the officers arrived at the scene, they found Ryan comforting the victim as he lay on the pavement. The officers asked the victim what had happened. Although Price was unable to provide a description of his assailant, the victim advised the officers that a black man approached him and asked "[w]hy you [sic] following me, man?" Price informed the officers that the man shot him and robbed him. The officers discovered two spent nine millimeter shell casings near Price's

2

vehicle. Price was transported to the "Med" and remained in surgery for nearly twelve hours. The doctors later reported that Price was paralyzed from the waist down due to a bullet which severed his spinal cord. On November 4, 1996, the victim lapsed into a coma. In January of 1997, he was transferred to St. Peter's Villa and later died on April 6, 1997.[1]

Following investigative leads, in March of 1997, Memphis police detectives questioned Steven Thomas, who gave a statement, regarding the shooting. Thomas told the police that he, the appellant, and the appellant's brother Delvin Lane went to the home of his cousin, Janika Stewart, at 618 Jeanette Place to calm a fight between Janika and her boyfriend. Finding nothing out of the ordinary, the three men decided to return to Thomas' home. Thomas related that after they returned to their vehicle, the appellant observed the victim, Price, standing next to a green Cadillac. None of the three were acquainted with the victim. The appellant got out of the vehicle and approached Price. The appellant and Price talked briefly. Then, Thomas heard a gunshot behind him from the direction the appellant had gone. The appellant quickly returned to Thomas' vehicle.

In April, Delvin Lane, the appellant's younger brother, gave a statement to the police which also implicated the appellant in the shooting. After giving his statement to the police, Lane telephoned the appellant to inform him that the police were looking for him for the murder of Tony Price. Lane, Pluria Hampton, and Tomika McCain, two other friends of the appellant, then assisted the appellant in purchasing a one-way ticket to Hawaii. McCain and Hampton drove the appellant to the airport.

When the appellant arrived in Honolulu, Hawaii, around 3:00 p.m., he was greeted by officers of the Honolulu Police Department. Later that afternoon, the

---

[1]The autopsy report established that the victim's death "was due to chronic pneumonia and respiratory insufficiency . . . due to prolonged ventilation dependency and cardiopulmonary arrest . . ., " resulting from a gunshot wound.

3

appellant met with Detective James Kawakami. The appellant waived his *Miranda* rights and agreed to speak with the detective. During initial questioning, the appellant denied any involvement in the robbery or murder of Price. He explained that his brother Lane had informed him that some other people were trying to frame him for a robbery and murder and that he needed to get out of town. He further stated that he left Memphis because he was supposed to be in court on an unrelated charge of "organized crime" involving some automatic handguns and crack cocaine; his brother also told him that he was wanted on seven or eight robberies in Memphis. The prior statements of Lane and Thomas to Memphis police investigators were made available to the Honolulu police department.

Later in the questioning, Detective Kawakami read the statements of Lane and Thomas to the appellant implicating him in the murder of Price. The appellant recanted his denial of any involvement and related that the crime transpired just as Lane and Thomas had said. He admitted that he shot once "towards his [Price's] leg, but I aimed at the ground." Then, he stated that Price ran toward him and he shot him again in the chest area. The appellant denied that he robbed the victim. He admitted shooting Price with a .380 automatic and related:

> I ain't never shot nobody in my life. . . . I've got a four-month old son I can't do nothing for now, because his dad's going to be in jail for murder. . . . [T]hat's the first person I shot in my life and he died. . . . [B]ut as much as I have prayed to the Lord for forgiveness of what I've done, every time I talk to a officer . . . , I lie about it. . . . .I did it, so I got to deal with it. I'm the triggerman.

The appellant was returned to the State of Tennessee on April 28, 1997.

At trial, the State called as its witness Delvin Lane, the appellant's brother. Lane denied any knowledge of the shooting; however, he testified that his statement to the police implicating the appellant was "[going] along with the plan."[2] Lane

---

[2]Although not raised as an issue, Tenn. R. Evid. 607 "permits impeachment by either party so long as the questioning is not a pretext for putting inadmissible hearsay before the jury." State v. Timmy Fulton, No. 02C01-9706-CC-00223, slip op. at 5 (Tenn. Crim. App. at Jackson, April 21, 1998), perm. to appeal denied, (Tenn. Dec. 28, 1998). See also Mays v. State, 495

provided that the "plan" involved an $8000 offer from Thomas to the appellant to confess to the "assault" of the victim; the payment for an attorney; and the posting of the appellant's bond. Lane testified he and the appellant went along with the plan because Thomas was the co-leader of the Gangster Disciples and feared his "power." Lane further explained that he feared for the appellant's life and assisted in purchasing him a ticket to Hawaii. Lane testified that he disposed of the gun that the appellant had given him before leaving.

Steven Thomas testified that he was presently incarcerated in the Shelby County Jail. Thomas' statement at trial was consistent with his prior statement to the police. Thomas denied any deal to pay the appellant $8,000 to take the blame for the "assault" of the victim. Thomas testified that he had not seen or talked to Lane since the shooting and had only seen the appellant in court. Furthermore, Thomas denied any gang involvement.

Pluria Hampton, a friend of the appellant, testified that in April of 1997, the appellant told her that "he got into it with a guy, and he shot him in the leg and that the homicide detective was looking for him. . . . [T]he guy was talking, and I shot him in the chest." The appellant related this information to her on the way to the airport. The appellant stated that he needed to leave because he was wanted for murder. Hampton further testified that the appellant was a Gangster Disciple and that she was a former "G" sister.

At trial the appellant explained that his initial denial to Detective Kawakami of any involvement in the shooting was the truth. He related that after the detective read the statements of Lane and Thomas to him that he remembered what he was

---

S.W.2d 833 (Tenn. Crim. App. 1972); see, e.g., State v. Randy Lee Jones, No. 01C01-9708-CC-00326 (Tenn. Crim. App. at Nashville, Aug. 19, 1999); State v. Steve Johnson, No. 02C01-9504-CC-00097 (Tenn. Crim. App. at Jackson, Feb. 27, 1997); State v. Roy L. Payne, No. 03C01-9202-CR-00045 (Tenn. Crim. App. at Knoxville, Feb. 2, 1993). The testimony of Delvin Lane comes perilously close to a violation of the rule announced in these cases.

supposed to tell the police when questioned about the murder according to Thomas'
plan. When the appellant read his brother's statement, he feared that his brother's
life was in danger because of retaliation from the Gangster Disciples. He further
stated that earlier in December, Thomas had visited him providing him with details
of the shooting. The appellant denied being a member of the Gangster Disciples.

Based upon the foregoing proof, the jury found the appellant guilty of
premeditated first degree murder.

## I. Motion to Suppress

The appellant argues that the trial court should have suppressed his
statement to Detective Kawakami because it was involuntary. Specifically, he
argues that under the totality of the circumstances that his will was overborne by the
officer because he: (1) was "weary after the long day of stress" from his flight to
Hawaii; (2) waited nearly three hours before he was interviewed by an experienced
detective; and (3) was duped into his reasons for fleeing Memphis and his
confession by the "suggestive" interrogation tactics of the officer and by the
production of the statements of Lane and Thomas. Thus, he contends the
statements should be suppressed as "a product of the officer's will" and not the
appellant's.

At the suppression hearing, the trial court heard testimony from Detective
Kawakami. Kawakami testified that on April 15, 1997, at 6:30 p.m., that he
interviewed the appellant, who was traveling under the assumed name of Victor
Lightning. After advising the appellant of his *Miranda* rights, the appellant signed
the waiver of rights form. Kawakami testified that the appellant never requested an
attorney at any point during the interview. He stated that he did not utilize force,
threats, or coercion during the interview and that the appellant's statement was
freely and voluntarily given.

6

At the conclusion of the hearing, the trial court recited the following findings of fact on the record:

> In my twenty-five years of practicing law, this is about the most professional system that Honolulu has for taking statements that I've ever seen. The rights themselves are worded in a very understandable way. . . . [T]hey're much easier to understand than the literal Miranda rights that the case law provides us with.
> The fact that a breath test . . . is given prior to taking a statement is remarkable.
> The statement itself was tape-recorded so there can be no dispute as to what was said by the defendant. And anyone who wants to can listen, as the officer pointed out, to the tone of voice, the manner of conversation. . . . The interview itself was about an hour long . . . that's not an excessive period of time. . . .
> He was given his rights at the airport at 3:30 when he was first taken into custody. He was given his rights the second time by this officer, initially, and then given the breath test. . . . And then he was given his rights a third time by this officer just prior to the taking of the statement. And we have a man who, by his statement, went through the 11[th] grade and is certainly mature enough to negotiate that trip from Memphis, Tennessee, to Honolulu, Hawaii, on a one-way-$900 ticket.
> I don't think his will was overcome. I think he gave the statement freely and voluntarily. . . . And the fact that he asked to see and was provided with copies of statements given by two witnesses . . . does not . . . suggest that the statement was not given freely and voluntarily.

When reviewing a trial court's findings of fact from a motion to suppress, the appellant court reviews under the following standard:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings
>
> of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

State v. Daniel, No. E1997-00142-SC-R11-CD slip op. at 4-5 (Tenn. Jan. 31, 2000) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). However, the application of the law to those facts found in the trial court remains a question of law reviewable by an appellant court under *de novo* review. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

In the present case, the record does not preponderate against the trial court's findings. The record fails to establish that the police exercised any compelling influence over the appellant or that he involuntarily made his statement to Detective Kawakami. It is undisputed that the appellant was advised fully and completely of his *Miranda* rights upon three occasions and one immediately prior to this interview. On his final occasion, the appellant signed a written waiver of his constitutional rights before making the statement to the investigator. We conclude that, under the totality of the circumstances, the appellant understood his constitutional rights; voluntary and effectively waived those rights; and voluntarily, intelligently, and understandably gave his statement. State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992) (citing Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612 (1966)). Accordingly, the trial court's denial of the appellant's motion to suppress was therefore proper. This issue is without merit.

Alternatively, the appellant argues that the trial court erred by not redacting portions of his statement that mentioned other crimes. He contends that the remainder of the statement contained "rambling repetitive responses" possessing no probative value. Specifically, he contends that the following statements of the appellant should have been redacted:

> (1) [Appellant] My brother told me that they had my name down for like seven or eight different robs - -being a suspect of seven, eight different robs. I'm like what? He's like, man, I ain't lying, . . . trying to get you. And the next day that he told me that, they going around with flier on - - on my face saying that I was wanted. They had robber/murder.
> (2) [Appellant] I don't know what he [Lane] told the police. I just know what he [Lane] telling me, that the detective was telling him [Lane]. They showed him [Lane] some kind of printout of me being a suspect in a lot of different robberies. They showed him [Lane] a statement of Steve saying I was the triggerman of this shooting.

Initially, we note that these two statements of the appellant were his explanations for fleeing Memphis and not offered as evidence of other crimes. The

robberies and fliers the appellant mentioned in his statement were his own fanciful creations. The trial court found that these statements regarding the other robberies/crimes were relevant and highly probative of the fact that the appellant was attempting to divert the officer's attention from the murder. The court further found that the statements were not offered to prove the truth of the matter asserted but for assessing the appellant's credibility and to provide context for the other statements made by the appellant.

Since the appellant's statement was an out of court statement, the hearsay rule is implicated. Tenn. R. Evid. 801(c) provides that "'hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted." However, the State did not offer these statements of the appellant to prove the truth of the statement that he was wanted for seven or eight robberies and that the Memphis police were passing his fliers around. Indeed, the State acknowledged that these statements were not true. The State offered the statement to demonstrate that the appellant continuously misled the police regarding his reasons for traveling to Hawaii in an attempt to divert attention from his flight from a murder charge. Thus, we find that the first two challenged statements do not constitute hearsay. See State v. Caughron, 855 S.W.2d 526 (Tenn.), cert. denied, 510 U.S. 979, 114 S.Ct. 475 (1993) (finding testimony of victim's statements were not hearsay when not offered to prove truth of matter asserted). Additionally, we conclude that these statements were relevant to establish his consciousness of guilt as evidenced by his flight to avoid apprehension and that their probative value sufficiently outweighs their prejudicial effect. See Tenn. R. Evid. 403. Accordingly, we conclude that these statements were admissible.

Additionally, the appellant contends that the statements of Lane and Thomas included within his recorded interrogation by Detective Kawakami were inadmissible

9

hearsay. At the trial, portions of the taped interview of the appellant by Detective Kawakami were introduced. Included within the taped interview and played to the jury were the statements of Lane and Thomas to Memphis police investigators. Lane's statement included statements made to him by the appellant, e.g., that he was "fixing to rob the dude" and the "dude wouldn't drop it off." Thomas' statement also included incriminating statements, e.g., "the defendant shot the man without any reason." The State on appeal offers no grounds for introduction arguing simply that the challenged statements were not prejudicial.

Indeed, the appellant's out of court statement, *i.e.*, "his confession," to Detective Kawakami is itself hearsay but is admissible under the hearsay exception of party admissions. See Tenn. R. Evid. 803(1.2)(A). The statements of Lane and Thomas included in Kawakami's interrogation of the appellant constitutes hearsay within hearsay. See Tenn. R. Evid. 805 (hearsay within hearsay not excluded if each part of combined statements fall within an exception). The statements of Lane and Thomas to which the appellant "manifested his adoption or belief in [their] truth" are also admissible under the party admissions hearsay exception. Tenn. R. Evid. 803(1.2)(B). The appellant acknowledged the truth of his statements to Lane and Thomas during questioning by Detective Kawakami. The fact that he recanted this adoption at trial goes to the issue of his credibility. Accordingly, we find no error in the admission of the statements.

## II. Jury Instruction

The appellant contends that the trial court erred by failing to contemporaneously instruct the jury, upon defense counsel's objection, following the testimony of Lane that the jury could only consider his prior inconsistent statement for impeachment purposes in determining credibility and not for substantive evidence. The trial court provided no contemporaneous limiting instruction. In the jury charge, however, the trial court included in its instructions that proof of a prior

inconsistent statement was probative only of credibility and was not to be considered as substantive evidence of the matter asserted in the statement.

The law in Tennessee is clear that prior inconsistent statements offered to impeach a witness can only be received for purposes of determining credibility and not as substantive evidence of the truth the statements assert. State v. Reece, 637 S.W.2d 858, 861 (Tenn. 1982). The supreme court recognized that the trial court's failure to give a limiting instruction may amount to fundamental error requiring reversal, even absent an objection and a special request, when the State's case is weak and the prior inconsistent statement is "extremely damaging." Reece, 637 S.W.2d at 861 (citing United States v. Lipscomb, 425 F.2d 226 (6th Cir. 1970)). The supreme court limited its holding in Reece to those cases in which "the impeaching testimony [was] extremely damaging, the need for the limiting instruction [was] apparent, and the failure to give it results in substantial prejudice to the rights of the accused." Reece, 637 S.W.2d at 861(citations omitted).

However, in a prior decision of this court, cited by the supreme court in Reece, we held that the failure to so instruct the jury is not prejudicially fatal if the trial court properly instructed the jury in its general charge on how to consider the evidence. See Martin v. State, 584 S.W.2d 830, 833 (Tenn. Crim. App. 1979) (citations omitted); see, e.g., State v. Antonio L. Saulsberry, No. 02C01-9710-CR-00406 (Tenn. Crim. App. at Jackson, Dec. 21, 1998), perm. to appeal granted on other grounds, (Tenn. June 21, 1999). We agree with the appellant that the trial court should have given a contemporaneous instruction to this effect when the impeaching statements were offered into evidence following the testimony of Lane, especially considering the nature of the statement that "the defendant attempted a robbery and shot the man because the man would not drop his money." Although error, the evidence in the record more than adequately established the appellant's guilt of this crime. Therefore, the admission of Lane's prior inconsistent statement

11

absent a contemporaneous limiting instruction, did not affect the outcome of the trial, and we deem any error to be harmless in accordance with Tenn. R. Crim. P. 52(a).  This issue is without merit.

For all of the foregoing reasons, the judgment of the trial court is affirmed.

_____
DAVID G. HAYES, Judge

CONCUR:

_____
JOE G. RILEY, Judge

_____
JOHN EVERETT WILLIAMS, Judge