IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
December 19, 2017 Session

## STATE OF TENNESSEE v. RONALD WAYNE GILBERT

**Appeal from the Criminal Court for Sevier County**
**No. 20805-II    Robert E. Lee Davies, Judge**

_____

### No. E2017-00396-CCA-R3-CD
_____

The defendant, Ronald Wayne Gilbert, appeals his Sevier County Criminal Court jury convictions of especially aggravated kidnapping and aggravated assault, challenging both the trial court's denial of his motion to strike the victim's testimony and his motion to dismiss based upon the failure to preserve certain evidence. We affirm the convictions and sentence but remand for correction of a clerical error in the judgment.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed; Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Alexandra Deas McMahan and Aaron M. Kimsey, Assistant District Public Defenders, for the appellant, Ronald Wayne Gilbert.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; James B. Dunn, District Attorney General; and Ronald C. Newcomb, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

In September 2015, the Sevier County Grand Jury charged the defendant with two counts of especially aggravated kidnapping, two counts of attempted first degree murder, two counts of aggravated assault,[1] and one count of violating an order of

---

[1]      The presentment in this case indicates charges of aggravated domestic assault, citing to Code sections 39-13-102 and -111, and the judgment indicates a conviction offense of aggravated domestic assault, citing to Code section -102. We note, however, that no such offense is proscribed by our criminal code. Code section 39-13-111 refers to domestic assault with reference to the simple assault statute proscribed in Code section 39-13-101. There is no corresponding proscription relative to the aggravated assault of a household or family member. Thus, the presentment and conviction reflect, in effect, a

protection.  One year later, the trial court entered an agreed order severing the first three counts of the presentment from the remaining counts.  After the defendant waived his right to a jury trial, the trial court conducted a bench trial in November 2016 on one count each of especially aggravated kidnapping, attempted first degree murder, and aggravated assault.

The State's proof at trial showed that the defendant and the victim, Brandi Gilbert, married in 1993 and had three children together.  By early March 2015, the family had relocated from California to Cosby, Tennessee.  While the family was still residing in California, the defendant struck the victim and one of their sons, and, in 2010, the defendant engaged in the first of several suicide attempts by trying to hang himself in front of the victim.  The victim explained that the defendant suffered from progressive multiple sclerosis.

During the first five weeks in which the family had resided in Cosby, the defendant remained secluded in the master bedroom of the family's residence.  During the rare occasions that the defendant emerged from the bedroom, he was "really, really vicious and verbally abusive."  On the morning of April 18, 2015, the defendant awoke uncharacteristically early and began packing to leave the house.  When the victim asked him what he was doing, the defendant told her that he was planning to purchase an airplane ticket to fly to California and "kill [their] son's girlfriend."  The victim was alarmed, and the couple argued.  The argument escalated to a point that the defendant was "so out of control" with "yelling and cussing" that the victim contacted the local domestic violence hotline.  The defendant grabbed the telephone and disconnected the call.  The hotline called the victim back, and eventually, the victim called 9-1-1, reporting to the operator that the defendant was suicidal and was threatening to kill other people.

After calling 9-1-1, the victim was standing in a doorway of the residence when the defendant "swept [her] feet out from under [her] and dropped down to sit on [her] chest."  The defendant placed a knife blade against the victim's throat and said, "I'll cut your f[***]ing throat, and then he ripped [the victim's] shirt up and put the blade to [her] stomach and said, I'll f[***]ing gut you."  The victim remained very still and quiet because she "saw [her] death on his face," and she believed that the defendant intended to kill her.  While the defendant was holding the knife against the victim's abdomen, he punctured her skin, drawing blood and leaving a small cut.

The defendant then "leaned back" on his heels and started to stand, at which point the couple's 11-year-old son threw himself between the defendant and the

charge of aggravated assault with a deadly weapon of a victim as defined by Code section 39-13-111(a).

- 2 -

victim. The victim screamed for her son to run, and as the victim stood up, she saw the defendant fleeing through the front door and escaping on a bicycle.

Sevier County Sheriff's Department ("SCSD") Deputy Jayson Parton was dispatched to the defendant's residence on April 18, 2015, in response to a domestic situation; Deputy Parton recalled that the call came in "through the domestic hotline" and that the situation involved the suspect's holding the victim at knifepoint. When Deputy Parton arrived at the scene, the victim and her minor son were present, along with Pittman Center Police Department ("PCPD") Officer Todd Myers. Deputy Parton observed that the victim appeared to be upset and scared. While Deputy Parton was interviewing the victim, SCSD Corporal Clint Parton arrived at the scene, and both Deputy Parton and Corporal Parton searched for the defendant, who had reportedly fled into the woods near his residence. Deputy Parton eventually took the victim to the residence of nearby neighbors. Before leaving the victim, Deputy Parton photographed the injuries to the victim's right hand and neck. Deputy Parton was equipped with a body camera during his interactions with the victim, and through Deputy Parton's testimony, the State introduced into evidence the video recording taken at the scene. The recording showed, among other things, the victim's intermittent writing of a statement.

Corporal Parton later located the defendant in a nearby barn. The defendant "had a dog collar or dog chain around his neck" and was "threatening to hang himself." The defendant was taken into custody without incident. Officers did not recover a knife from the defendant.

With this evidence, the State rested. Following the trial court's denial of the defendant's motion for judgments of acquittal, the defendant elected not to testify and chose to present no proof. Based on this evidence, the trial court convicted the defendant as charged of both especially aggravated kidnapping and aggravated assault, and the court found the defendant not guilty of attempted first degree murder. Following a sentencing hearing, the trial court sentenced the defendant as a mitigated offender to a term of 13 and one-half years' incarceration for the especially aggravated kidnapping conviction, to be served at 100 percent by operation of law and to be served concurrently with the defendant's mitigated sentence of 2.7 years for the aggravated assault conviction.

Following the denial of his motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends that the trial court erred by failing to strike the victim's testimony based on the State's inability to produce the victim's written statement and that the State's failure to preserve a video recording from an officer's body camera violated his due process rights. We will address each issue in turn.

## I. Lost Statement

The defendant first contends that the trial court erred by failing to strike the victim's testimony on the basis that the State could not produce the victim's written statement purusant to Tennessee Rule of Criminal Procedure 26.2. The State responds that the trial court acted within its discretion in denying the defendant's motion.

During the trial, Deputy Parton, who was the first witness to testify, stated that the victim provided a written statement at the scene, and when asked by the prosecutor to produce a copy of the statement from his investigative file, Deputy Parton discovered that the statement was missing. He informed the prosecutor that the statement "would be on file at the [SCSD]," and he agreed to return to the SCSD following his testimony to retrieve the statement prior to the victim's trial testimony. After Deputy Parton returned to court a short time later, defense counsel informed the trial court that the deputy had been unable to locate the victim's statement. Defense counsel then moved the court, pursuant to Tennessee Rule of Evidence 613, to dismiss the case on the basis that the statement had not been provided to the defendant through his discovery request and that the missing statement deprived him of the right to "potentially impeach" the victim. The prosecutor responded that the statement had not been provided through the discovery process because the State "never had possession of it"; that disappearance of the statement was "not an intentional act by the State"; and that the State had no ability to provide something that it did not have. The prosecutor informed the trial court that defense counsel had the recordings of the victim's 9-1-1 calls, the victim's oral statements on Deputy Parton's body camera in which the victim could be seen working on her written statement, and the victim's preliminary hearing testimony, and that under the circumstances, dismissal of the case would be an extreme sanction.

Defense counsel then responded that dismissal was required under *State v. Merriman*, 410 S.W.3d 779 (Tenn. 2013), based on the "destruction of potentially exculpatory evidence" which could lead to a prior inconsistent statement. The prosecutor countered that nothing in the record indicated that the victim's written statement was exculpatory. The trial court then declined to dismiss the case at that time, noting that there was "a whole lot of other evidence and avenues available for [defense counsel] to confont the [victim] whenever she does take the stand."

Following the victim's direct examination, the trial court readdressed the defendant's motion, confirming that the motion was based on a combination of the "Jencks Act on producing exculpatory statements combined with our [s]upreme [c]ourt's ruling in [*State v.*] *Ferguson*[, 2 S.W.3d 912 (Tenn. 1999)] and *Merriman*." At the court's request, Deputy Parton returned to testify. Deputy Parton explained that it was

his usual practice to make a photocopy of a statement and place the photocopy in his investigative file while giving the original statement to the SCSD records department. When he learned for the first time during his earlier testimony that the victim's statement was not in his file, he realized that he must have failed to photocopy it. During the break in his testimony, he proceeded to the SCSD records department and "asked the girls to pull" the original statement, but the department employees were unable to find it. Deputy Parton recalled placing the original statement in the appropriate records collection box, and he was unaware of any instances in which statements or other records had been misfiled by the records department. Deputy Parton testified that he recalled reading the victim's statement, but when the trial court asked him if he could remember the content of the victim's statement, Deputy Parton conceded that he could not.

Following argument by the parties, the trial court ruled that the State had a duty to preserve the victim's statement and was negligent in its failure to do so. With respect to the potentially exculpatory nature of the statement, the court observed that it had "no idea whether it would be potentially exculpatory," although the court acknowledged that it "could be" if the victim had written something "inconsistent with her testimony here today." The court found that there was "not much negligence on the part of" Deputy Parton and stated that it was unsure of the significance of the statement in light of the contemporaneous video and audio recording of the victim's explaining to Deputy Parton what had transpired, in addition to the 9-1-1 recordings and the victim's preliminary hearing testimony. Finally, the court stated that the case would "rise or fall" solely on the victim's testimony and encouraged defense counsel to use the missing statement in its argument to the court concerning the victim's credibility. Ultimately, the trial court concluded that dismissal of the case was unwarranted.

During the victim's cross-examination, she testified that she did not recall writing a statement because it was such a "nightmarish" time. The victim agreed that if an officer had asked her to write a statement, she would have complied, and she agreed that she was seen on the video holding a piece of paper and conceded that she was interrupted several times on the video while purportedly writing that statement. The victim denied having a copy of the statement or ever seeing it after she had signed it. She acknowledged that anything contained in the written statement would have been consistent with the oral statements she was seen and heard making to the officers on the video recording.

At the hearing on the motion for new trial, the defendant abandoned his argument under *Ferguson* and *Merriman* and instead relied exclusively on Tennessee Rule of Criminal Procedure 26.2 for the proposition that the victim's statements should have been suppressed and that, without those statements, the defendant would be entitled

to a new trial.  The trial court took the motion under advisement and later issued an order denying the defendant's motion and finding as follows:

> In this case, there is no doubt of the existence of the written statement since the video of Deputy Parton with the [SCSD] clearly showed the [victim] sitting down at a table writing out her statement after she was interviewed on video by the deputy.  However, for reasons that cannot be explained, no one could locate the statement of [the victim] at trial.  The [c]ourt even took a recess to allow law enforcement to go back through their files to search for the statement.  Defendant has not argued and there appears to be no evidence of any bad faith on the part of any officer involved in this case.  Pursuant to Rule 26 of the Tennessee Rules of Criminal Procedure, the State has conceded that it had a duty to preserve the written statement.  Deputy Parton testified that he thought he had made a copy of the original statement and put the copy in his working file.  He indicated that the original statement should have been filed with the Records Division of the [SCSD].  After not being able to find a copy in his file, Deputy Parton went to the Records Division of the [SCSD] and asked for the original statement.  The Records Department was unable to locate it.
>
> The most important factor in the [c]ourt's analysis in this case is the significance of the lost or destroyed statement of the witness in light of the probative value and reliability of secondary evidence.  Here, there was a video and audio recording of the victim giving her version of the facts to the investigating deputy on the scene.  Counsel for the [d]efendant testified she had reviewed this video for at least twelve hours and had made extensive notes.  In addition, the defense had the two 911 calls made by the victim.  Finally, the victim testified at the preliminary hearing where she was subject to cross examination, and the defense had the transcript of that testimony.  The [c]ourt concludes that the statement of the [victim] would merely be cumulative in this case and resulted in no prejudice to the [d]efendant.
>
> The [c]ourt's verdict in this case was based primarily on the testimony of the victim.  The [c]ourt allowed the

[d]efendant wide latitude in cross examination of the victim, and the [d]efendant was able to bring out certain potential bias[es] or inconsistencies in the victim's testimony. However, considering the victim's testimony as a whole, the [c]ourt concluded that [the victim] was credible and that the assault which she described by the [d]efendant happened as she described it.

On appeal, the defendant posits that the trial court erred, first, in its application of the *Ferguson* and *Merriman* standards to the victim's missing statement and, second, in failing to strike the victim's testimony pursuant to Rule 26.2.

Rule 26.2 of the Tennessee Rules of Criminal Procedure had its genesis in the United States Supreme Court holding in *Jencks v. United States*, 353 U.S. 657 (1957), wherein the Court ruled that a criminal defendant had the right to inspect prior statements or reports by government witnesses following direct examination for use in cross-examination. *See State v. Caughron*, 855 S.W.2d 526, 535 (Tenn. 1993). The rule provides that, following the direct trial testimony of a witness other than the defendant and on motion of, in this case, defense counsel, the court "shall order the attorney for the [S]tate . . . to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony." Tenn. R. Crim. P. 26.2(a). A "statement" includes either a written statement made and signed, or otherwise adopted by, the witness, or "[a] substantially verbatim, contemporaneously recorded recital of the witness's oral statement that is contained in a stenographic, mechanical, electrical, or other recording or a transcription of such a statement." Tenn. R. Crim. P. 26.2(f). "If the party who called the witness disobeys an order to deliver a statement, the court shall strike the witness's statement from the record and order the trial to proceed," and if the prosecutor disobeys the order, the court "shall declare a mistrial if required in the interest of justice." Tenn. R. Crim. P. 26.2(d).

The defendant's reliance on Rule 26.2 is misplaced. First, the rule requires that the State possess the statement sought by the defendant. Tenn. R. Crim. P. 26.2(a). In the instant case, nothing indicates that the State ever possessed the victim's written statement, either through actual or constructive possession. Second, the sanctions prescribed by the rule are only applicable when the State disobeys a court order to deliver the statement. Tenn. R. Crim. P. 26.2(d); *see also State v. Barry Singleton*, No. W2006-02476-CCA-R3-CD, slip op. at 6 (Tenn. Crim. App., Jackson, Apr. 29, 2009); *State v. Joseph Angel Silva, III*, No. M2003-03063-CCA-R3-CD, slip op. at 11-12 (Tenn. Crim. App., Nashville, May 25, 2005). Here, the court never ordered the State to turn over the witness's statement to the defense because the statement had been unintentionally lost.

Interestingly, both parties quote *State v. Jim Inman*, No. 03C01-9201-CR-00020 (Tenn. Crim. App., Knoxville, Nov. 23, 1993), for the proposition that Rule 26.2 sanctions are not dependent upon a showing of bad faith and that even the "unintentional" withholding or destruction of a statement can constitute a violation of Rule 26.2. In *Jim Inman*, however, this court stated that the "[i]ntentional withholding or destruction of statements, regardless of motive, may be viewed as a violation of Rule 26.2 for which appropriate sanctions may be applied." *Id.*, slip op. at 23 (admonishing the Tennessee Bureau of Investigation for its practice of "routinely eras[ing]" tape-recorded witness statements). It appears that this statement regarding "intentional withholding" was originally misquoted as "unintentional withholding" in *State v. Timmy Fulton*, No. 02C01-9706-CC-00223, slip op. at 8 (Tenn. Crim. App., Jackson, Apr. 21, 1998), and was again misquoted in *State v. Susan Jo Walls*, No. M2014-01972-CCA-R3-CD, slip op. at 36 (Tenn. Crim. App., Nashville, Apr. 7, 2016), a case on which both parties appear to have relied extensively in addressing the legal portion of this issue in their briefs before this court.

In any event, Rule 26.2 does not cover the *unintentional* loss of a witness's statement. If it did, it would eliminate the need for the application of *Ferguson* and *Merriman* to lost or destroyed statements and would lead to an absurdity.

This issue is appropriately analyzed, as it was initially by the trial court, under the rubric of *Ferguson* and *Merriman*. In *Ferguson*, our supreme court "explained that the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." *Merriman*, 410 S.W.3d at 784 (citing *Ferguson*, 2 S.W.3d at 915-16). The court observed that "the due process required under the Tennessee Constitution was broader than the due process required under the United States Constitution" and rejected the "bad faith" analysis espoused by the United States Supreme Court, *Merriman*, 410 S.W.3d at 784-85 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) (holding "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law")), in favor of "a balancing approach in which bad faith is but one of the factors to be considered in determining whether the lost or destroyed evidence will deprive a defendant of a fundamentally fair trial," *Merriman*, 410 S.W.3d at 785. The supreme court "observed that fundamental fairness, as an element of due process, requires a review of the entire record to evaluate the effect of the State's failure to preserve evidence." *Id.* at 784-85 (citing *Ferguson*, 2 S.W.3d at 914, 917).

To facilitate this "balancing approach," our supreme court ruled that the trial court must first "determine whether the State had a duty to preserve the evidence," *Merriman*, 410 S.W.3d at 785, and observed that the State's duty to preserve was "limited to constitutionally material evidence," *id.* The court held that to be

"constitutionally material," the evidence "must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* (citing *Ferguson*, 2 S.W.3d at 915, 918). "If the trial court determines that the State had a duty to preserve the evidence, the court must determine if the State failed in its duty." *Merriman*, 410 S.W.3d at 785 (citing *Ferguson*, 2 S.W.3d at 917). If the trial court concludes that the State lost or destroyed evidence that it had a duty to preserve, the trial court must then consider three factors to determine the appropriate remedy for the State's failure:

> "(1) [t]he degree of negligence involved;
> (2) [t]he significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and
> (3) [t]he sufficiency of the other evidence used at trial to support the conviction."

*Merriman*, 410 S.W.3d at 785 (quoting *Ferguson*, 2 S.W.3d at 917). "If the trial court concludes that a trial would be fundamentally unfair without the missing evidence, the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." *Merriman*, 410 S.W.3d at 785-86.

We review the trial court's decision concerning the fundamental fairness of a trial conducted without the missing evidence under a de novo standard of review. *Id.* at 791 ("Because the application of *Ferguson* . . . presents a constitutional issue, we will apply a de novo standard of review to the trial court's decision concerning the fundamental fairness of the trial."). The trial court's choice of remedy, however, will not be overturned on appeal absent a showing that the trial court abused its discretion. *Id.* at 792 ("Thus, when the chosen remedy is consistent with the findings made by the trial court utilizing the *Ferguson* considerations, we will not overrule that choice on appeal.").

In the instant case, we begin by concluding that, contrary to the defendant's assertion, the trial court committed no error in its application of the *Ferguson* and *Merriman* standards. Indeed, the trial court, after determining that the State had failed in its duty to preserve the victim's statement, thoroughly considered all relevant factors before determining that the dismissal of the case was unwarranted. The trial court went on to say that, as the trier of fact, it would "take into consideration the fact that there was a statement and now it's missing or lost, for [defense counsel] to make whatever argument you want to make out of that to [the court] concerning credibility" and that the court intended to take its "cues from the live testimony that [it] hear[s] today and what [the court has] seen on the video that's been played by the victim and what [the court has]

heard the victim say on the date that this incident allegedly occurred." Given the additional evidence of the victim's statements through the 9-1-1 recordings, the body camera footage, and the preliminary hearing testimony, we cannot say that the absence of the victim's written statement resulted in a proceeding that was fundamentally unfair, and we find no abuse of discretion in the lower court's denial of the defendant's motion to dismiss.

## II. Failure to Collect Evidence

The defendant contends that the trial court erred by failing to find that the defendant's due process rights had been violated by the loss or destruction of a video recorded at the crime scene by Officer Myers. The State responds that the trial court properly determined that the video recording did not exist.

When it came to light at trial that the victim's written statement was missing, the trial court asked the parties if there was any additional video footage from a different officer's body camera, and the State responded that it had requested "all videos" and that the only videos it was aware of were those of SCSD Deputy Parton. Defense counsel stated that Deputy Parton, during his testimony, had referenced the body camera worn by PCPD Officer Myers and that "though the State has no duty to produce evidence that doesn't exist or have a duty to create evidence," the possible existence of a video taken from Officer Myers' body camera could provide potentially exculpatory material. The trial court ruled that there was "no evidence whether the video exists" and suggested that the defense would need "to explore that with" Officer Myers. Officer Myers was not called as a trial witness by either party.

When the trial court readdressed the defendant's motion to dismiss based on the victim's missing statement at the conclusion of the victim's direct examination, defense counsel mentioned that the motion was also based on "the potentially missing video." The court responded that if counsel was basing the motion "on a potentially missing video, there is no proof that the video even existed" and without such proof, the court must deny the motion.

At the hearing on the motion for new trial, the State presented the testimony of PCPD Officer Myers, who stated that he was equipped with a body camera when he responded to the victim's 9-1-1 call on April 18 but that he did not recall activating the camera during his interactions with the victim. Officer Myers explained that his camera could be activated by either pushing a button or by using a voice-activated or "VOX" option that would initiate recording upon detecting the sound of someone's voice. Officer Myers testified that he did not use the VOX option on April 18. When he later located the defendant hiding in a barn, Officer Myers pushed the button to activate his

camera and recorded the defendant "standing on a chair" with "two dog leashes around his throat and around the rafter of the barn." Officer Myers recalled reviewing the video footage to ensure that his camera had been operational.

The State also called PCPD Chief Michael Voncannon, who testified that he had examined the department's computers on four separate occasions and found no videos from Officer Myers. Chief Voncannon stated that the department no longer used body cameras and that he had no way of determining whether any videos from Officer Myers had ever been loaded onto the department's computers or if any videos had been deleted. Chief Voncannon stated that, at the time of victim's assault, the PCPD employed a total of four officers.

At the conclusion of Chief Voncannon's testimony, the defendant argued that he had "established that there was a video" on the basis that Officer Myers had activated his body camera during his encounter with the defendant and that it followed that the officer must have recorded his earlier interactions with the victim. In denying the defendant's motion for new trial, the trial court concluded that there was "no proof that Officer Myers actually had a video of his initial encounter with" the victim.

We begin our analysis of this issue by observing that *Ferguson* requires the initial step of determining whether law enforcement officers had a duty to preserve the evidence at issue. *Ferguson*, 2 S.W.3d at 917. At trial, neither party called Officer Myers as a witness, and no proof was presented to show that a video recorded by Officer Myers ever existed. Thus, the trial court's denial of the defendant's motion to dismiss on this basis should have ended the inquiry. However, in response to the defendant's revisting the issue in his motion for new trial, the State presented the testimony of both Officer Myers, who stated that he had not recorded his interactions with the victim, and Chief Voncannon, who testified that no video created by Officer Myers existed. "[T]his court has repeatedly refused to grant *Ferguson* relief when there was no proof that the alleged evidence existed." *State v. Angela K. Pendergrass*, No. E2013-01409-CCA-R3-CD, slip op. at 9 (Tenn. Crim. App., Knoxville, Mar. 25, 2014); *State v. Randall S. Sparks*, No. M2005-02436-CCA-R3-CD, slip op. at 6 (Tenn. Crim. App., Nashville, Aug. 4, 2006) (citing *State v. Timothy D. Prince*, No. M2004-01262-CCA-R3-CD, slip op. at 5 (Tenn. Crim. App., Nashville, May 3, 2005); *State v. Linda H. Overholt*, No. E2003-01881-CCA-R3-CD, slip op. at 7 (Tenn. Crim. App., Knoxville, Jan. 21, 2005); *State v. George R. Croft*, No. W2001-00134-CCA-R3-CD, slip op. at 7 (Tenn. Crim. App., Jackson, Nov. 20, 2002)). Because a video recording by Officer Myers never existed, the defendant is not entitled to relief.

*III. Correction of Clerical Error*

Although not raised by either party, we detect an error that requires correction in the defendant's judgment for aggravated assault. Based on the transcript of the sentencing hearing, the defendant was sentenced as a mitigated offender, and on the judgment form in count 3, the trial court correctly checked the box for "Mitigated" in the offender status section. In the release eligibility section, however, the trial court erroneously checked the box for "Standard 30%." On remand, the trial court should amend the judgment to reflect the proper mitigated release eligibility percentage.

*Conclusion*

Based upon the foregoing analysis, we affirm the judgments of the trial court but remand for correction of the aggravated assault judgment as outlined in this opinion.

_____
JAMES CURWOOD WITT, JR., JUDGE